IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                        )
                              )
UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )
                              )
v.                            )Case No. 2:17-CR-208CW
                              )
TERRY CHARLES DIEHL,          )
                              )
_____Defendant._____)



Transcript of Hearing on Motions in Limine



BEFORE THE HONORABLE CLARK WADDOUPS


October 26, 2017




Karen Murakami, CSR, RPR
8.430 U.S. Courthouse
351 South West Temple
Salt Lake City, Utah 84101
Telephone: 801-328-4800

<u>APPEARANCES OF COUNSEL</u>:


For the Plaintiff:   MARK Y. HIRATA
                     CY H. CASTLE
                     Assistant U.S. Attorneys
                     Suite 1800
                     111 South Main Street
                     Salt Lake City, Utah 84111


For the Defendant:   SMITH CORRELL LLP
                     By D. Loren Washburn
                        Attorney at Law
                     Suite 1010
                     50 West Broadway
                     Salt Lake City, Utah 84101

                     PETERS LAW FIRM LLC
                     By Stephen C. Peters
                        Attorney at Law
                     Suite 3400
                     1700 Lincoln Street
                     Denver, Colorado 80203

1       Salt Lake City, Utah, Thursday, are October 26, 2017

2                              *   *   *

3               THE COURT:  Good morning.  We are here in

4       the matter of the United States v. Terry Charles Diehl,

5       case 2:17-cr-208.  Will counsel please state their

6       appearance.

7               MR. HIRATA:  Mark Hirata and Cy Castle, Your

8       Honor, on behalf of the United States.

9               THE COURT:  Thank you.

10              MR. WASHBURN:  Loren Washburn and Stephen

11      Peters for Terry Diehl, who is in the courtroom as well.

12              THE COURT:  Thank you.

13              We're here on several -- maybe collectively

14      just really one motion, but we have several different

15      motions.  They are your motions, Mr. Washburn.  I'll let

16      you pick the order you want to argue them in and you may

17      proceed.

18              MR. WASHBURN:  First of all, Your Honor, I

19      note having had the Third Superseding Indictment

20      returned and had the initial appearance on it today, the

21      motion to strike surplusage we'll formally withdraw

22      that, we mentioned that on Tuesday, but that's not now

23      an issue.

24              THE COURT:  We'll indicate on the docket

25      that that's been withdrawn.

```
 1              MR. WASHBURN:  I think then, Your Honor, we
 2   have just two motions, and I plan -- I think there --
 3   you're probably right in saying there's some overlap in
 4   them, but I plan to take up what we've styled as the
 5   motion to exclude bad acts not charged in the Second
 6   Superseding Indictment, which I guess now would be the
 7   Third Superseding Indictment.  But the motion wouldn't
 8   change because of the changes in the Indictment.  And
 9   then Mr. Peters is planning to take up specifically the
10   issues raised in our motion to enforce the prior order
11   in limine.
12              Your Honor, in our motion, our motion was
13   prompted -- and I apologize for the short timeline.  As
14   it turns out, we had our hearing on the 12th, I left for
15   Ireland on the 13th and got back the 21st.  So when I
16   got back we had a brand new Indictment, and so I rushed
17   to get this motion put together and between Saturday
18   night at 10:00 when my flight landed and Monday, as soon
19   as I could.  The point of the motion in limine is when
20   we talked about this last about our motion to exclude
21   other acts, and specifically with the other acts here
22   now we're talking about two categories, that's the
23   American Express expenditures and personal expenditures
24   out of the SVA accounts.  When we talked about it last
25   we had a very different Indictment.  I know the
```

1   government in their response yesterday said it's not a

2   very different Indictment, but I think that's because

3   they're actually not looking at what's charged in the

4   Indictment.  They talk about having the same theory, but

5   having the same theory isn't the same as having the same

6   charges.  And it's the charges and the elements that

7   something has to be relevant to in order to have an

8   other act admitted.

9           I want to note a couple of things before I

10  really get into it in earnest.  The first thing, Your

11  Honor, is that throughout their argument, and I

12  mentioned this on the 12th when we had argument, the

13  government doesn't seem to take account of the fact that

14  this was a Chapter 11 bankruptcy.  And that matters and

15  it matters in a very important way, and that's this:

16  Skyline Ventures Associates was never hidden.

17  Starting -- and I apologize, I've got a fair number of

18  exhibits here that I'll pass up as we go along.  These

19  are Government's Exhibit 2-12 and 2-14.  These are just

20  examples of monthly operating reports, Your Honor.  2-12

21  was the one filed for April of 2012, so this was filed

22  just a couple of weeks after the Statement of Financial

23  Affairs.  And what you'll see there is a source of

24  income.  When you look at the income, I think it's on

25  the third page, it lists Skyline Ventures Associates,

1   consulting fees of $10,000, and then has a refund of

2   overdraft fee from Chase of $34.  And what you will see

3   if you look through all of the monthly operating

4   reports, which are in the Government's Exhibit series,

5   is that over the period of the bankruptcy SVA is listed

6   as a source of 96 percent of Mr. Diehl's reported

7   income.

8            Now, in a Chapter 11 what you have is a

9   debtor who comes and says, look, I can't pay all my

10  debts.  I want to reorganize, I want to have a plan to

11  pay you back.  And in forming a plan to pay them back

12  they have to articulate where their money is going to

13  come from to make that plan.  Mr. Diehl reported SVA

14  from the very beginning as a source of his income.

15  We'll look a little bit later at his 2004 exam where he

16  says it's his only employer and that the deals that he's

17  planning to put together as part of his plan of

18  reorganization will be held in Skyline.  So there was

19  never -- the fact of this as a Chapter 11 matter,

20  because not only did he not exclude it, it would have

21  been counterproductive for him to hide it.

22            The other thing I want to bring to the

23  court's attention is the government in their opposition

24  I think mis-describes their Indictment.  The now Third

25  Superseding Indictment contains one count that we're

1    worried about here.  These other acts, as far as I
2    understand it, don't go at all to Count 2 in the Third
3    Superseding Indictment, they only go to Count 1.  And
4    specifically Count 1 has two prongs to it.  It's a false
5    statement in bankruptcy.  This is -- you know, when I
6    was at the Tax Division, we called false return counts,
7    like Count 2, tax perjury.  And that's essentially what
8    this is, this is bankruptcy perjury, if you will.  It's
9    coming in and making a specific false statement.  And
10   this count alleges two of those.  One of them relates to
11   a million dollars.  And I think Mr. Hirata said on
12   Tuesday that this motion doesn't go to that million
13   dollars, and I would tend to agree with him.  If I'm
14   mischaracterizing him, I apologize.
15          But really I think what the government is
16   intending to do from what I gather from their opposition
17   is to introduce these other acts that are contested
18   right now to go to what I'll call the second prong in
19   Count 1, and that is the Indictment alleges that
20   Mr. Diehl omitted SVA.  There's a specific question on
21   the Statement of Financial Affairs, and the Indictment
22   alleges that SVA ought to have been reported and was
23   not.  That's it.  The government talks about subterfuge
24   and setting up SVA as a subterfuge to funnel money and
25   pay personal expenses and that that's their theory.

1    That's not the crime he's charged with.  He's charged

2    with coming in and making two specific false statements.

3    And the one that's at issue here is that one specific

4    statement with regard to Count 18.

5              Why does that matter, Your Honor?  It

6    matters for a couple of reasons.  One of them being

7    we're going to look at the elements because in order for

8    404(b) evidence to be relevant it has to be relevant to

9    one of those elements.  But first I think it's important

10   to understand what the stakes are here.  And for that

11   I'll show you Exhibit 2.  I've got a tab on the

12   important part here both for you and for the government.

13   I'll pass one up to your clerk as well.  I apologize

14   that I didn't do that on the last one.  So I just passed

15   up two documents.  The larger one, Exhibit 2, is a

16   document called the Operating Guidelines and Reporting

17   Requirements of the United States Trustee.  And this was

18   provided to Mr. Diehl, I believe that's what the

19   testimony will show.  And if you go to page 12 where

20   it's tabbed it talks about reports on entities in which

21   debtor holds an interest.  Okay.  And what that says is

22   that pursuant to Federal Rule of Bankruptcy 2015.3, and

23   that's the smaller document I've handed up is that rule,

24   the debtor must file periodic reports of the value,

25   operations, and profitability of each entity in which

1    they hold a substantial or controlling interest.  And it

2    says the first one needs to be filed within seven days

3    of the 341 and then they need to be filed every six

4    months thereafter.

5              Here's what's important there, Your Honor.

6    If Mr. Diehl had listed SVA on the SOFA as something

7    that he owned -- and let's assume for present purposes,

8    for purposes of this argument, we'll assume that the

9    government will be able to show that it should have been

10   listed.  I'm not conceding that for purposes of the

11   trial, I'm just saying for today's argument.  What

12   difference would it have made?  Well, he wouldn't have

13   been required, and this is the specific point, he would

14   not have been required under the law that I've just

15   passed up here to report transaction-level detail.  All

16   that would have been required is every six months there

17   be a report that listed the profitability -- the value,

18   operation, and profitability of the entity.  That's it.

19   That's the difference, Your Honor.

20             Now, given, as I've shown, that SVA was

21   in -- not just disclosed in the bankruptcy, disclosed in

22   a way that any creditor in the Chapter 11 was going to

23   see it as here's the source of income.  And given that

24   the only difference would have been periodic reports,

25   the question becomes, well, what -- you know, we're

1    attempting to show that these -- what was his intent to

2    defraud in failing to list SVA?  And I think it's

3    important to understand the consequences of listing SVA

4    in order to evaluate whether something's relevant to his

5    intent to not list it, and specifically where listing it

6    would not have required him to disclose

7    transaction-level details, such as these expenditures.

8    There's not a strong incentive not to list it on there

9    and trigger that reporting requirement because the

10   reporting requirement that would have been triggered

11   would not have required transaction-level reporting.  I

12   apologize, Your Honor, I'm going to grab a bottle of

13   water here.

14           I want to now take a look at the Superseding

15   Indictment that we were looking at last time versus this

16   Second Superseding Indictment because last time we were

17   here Mr. Hirata, and this is the only one I remember,

18   but showed us and gave us each a copy of this big chart,

19   and the argument as I recall it, and I may be

20   misremembering it, and if I am I'm sure you'll hold it

21   against me, but the argument as I recall it was we need

22   to introduce these individual expenditures because what

23   we have charged in our Indictment, and this is true of

24   the Superseding Indictment, we've charged all of these

25   times of concealment, that there was money that was

1   concealed, that there was money that came in that should

2   have been reported on monthly operating reports but

3   wasn't.  And what we want to show you, Your Honor, is

4   that these individualized expenditures that weren't for

5   the operation of SVA they go to show that when he

6   concealed this income, he had motive to do it, and that

7   motive was he was going to use it on something that the

8   bankruptcy creditors wouldn't have been happy about, and

9   so that's why he concealed it.  As I understand it, that

10  was basically their argument for why the evidence of

11  these personal expenditures ought to come in.

12            And in the context of the Indictment where

13  they had actually charged counts of concealment and

14  counts of failing to report financial transactions

15  that's an entirely different analysis than this

16  Indictment, because in this Indictment we don't have a

17  single count of concealment or a single count of failure

18  to disclose a financial transaction taking place during

19  the bankruptcy.  And what I tell you, Your Honor, is

20  Count 1, that first prong with the million dollars, is

21  qualitatively different than that.  That was about

22  reporting his annual income.  That money was spent

23  before the bankruptcy was ever declared.  That's not

24  about concealment in order to hide an asset or something

25  like that.  It's qualitatively different than the

1    concealment and false items that in the Superseding

2    Indictment comprise Counts 2 through 12.  And because we

3    don't have that, this analysis is different.  This isn't

4    a motion to reconsider the prior motion.  This is we

5    have a different Indictment, and where we have a

6    different Indictment we have a different 404(b)

7    analysis, and the reason we have a different 404(b)

8    analysis is because what's intrinsic is different if

9    what's charged is more narrow.  Something that might be

10   intrinsic to a concealment count is not necessarily

11   intrinsic to a false statement where you left SVA off of

12   the SOFA, okay?

13            The government's first argument in their

14   opposition to our motion, and really it seemed a more

15   robust argument, was that this was intrinsic.  But, Your

16   Honor, where -- the evidence, the elements that they

17   have to prove in order to prove Count 1 as to SVA are

18   pretty simple.  And what we'll see is at no point is

19   later expenditures inextricably intertwined with that.

20   First they have to prove there was a bankruptcy

21   proceeding; second, that he made a statement, that is,

22   he listed here his failure to disclose in response to

23   question 18 in the Statement of Financial Affairs

24   Skyline Ventures Associates.  I'm looking right now,

25   Your Honor, at what is in their opposition in a footnote

1    on page 2, listing of the elements.  I believe that

2    comes off of a proposed jury instruction.

3            The third element is that the declaration

4    contains some material fact.  And SVA, as an entity

5    that -- they make some argument that, hey, leaving SVA

6    off as an entity was a material fact.  But those

7    personal expenditures don't demonstrate that, Your

8    Honor.  The personal expenditures aren't necessary to

9    demonstrate that, they're not intertwined with that.  If

10   this is an entity that owned and operated, they can

11   demonstrate that, and, Your Honor, they can demonstrate

12   it through the monthly operating reports that were filed

13   where Skyline Ventures is listed.  There's no need, nor

14   is it inextricably intertwined, to say, hey, in order to

15   prove that SVA was material we have to show these later

16   personal expenditures.

17           Fourth, the declaration was false in whole

18   or in part.  They won't be proving -- the personal

19   expenditures won't go to prove that it was false in

20   whole or in part.  The defendant made the declaration

21   knowingly, and the defendant made the declaration

22   fraudulently.  Those are the elements.

23           And the declaration we're talking about

24   here, Your Honor, the fraudulent intent is they have to

25   demonstrate that Mr. Diehl intended to defraud by

1   failing to list SVA, not this uncharged theory of he

2   intended to defraud by having SVA be a subterfuge.

3   That's not the intent to defraud that we're examining

4   when we're examining whether these expenses are proper

5   under 404(b).  The intent to defraud is the intent that

6   they need to prove for the charges they've actually

7   brought, and the charges they've actually brought are an

8   intent to defraud by failing to disclose SVA.

9           In their opposition they also, aside from

10  arguing it's intrinsic, they also sort of do a laundry

11  list of 404(b) purposes.  If you look at their 404(b)

12  motion they say, hey, these personal expenditures were

13  relevant for planning, to show planning.  Again, the

14  planning they would have to show is a planning to fail

15  to list SVA on the SOFA.  So now how does expenditures

16  from SVA, how do later personal expenditures from SVA

17  show planning to fail to list the SOFA -- or to fail to

18  list SVA on the SOFA.  SOFA being Statement of Financial

19  Affairs, I apologize if that acronym is ...

20          Preparation, same thing, Your Honor, later

21  expenditures don't show preparation to fail to list SVA

22  on the SOFA.

23          Knowledge, later expenditures don't show

24  knowledge that SVA wasn't listed on the SOFA.  In fact,

25  we'll come back to that, and what you'll see is, if

1    anything, those expenditures show -- the expenditures go

2    the opposite direction in terms of relevance.

3            Intent, and the government -- I think this

4    is important, Your Honor, because if you look at the

5    intent that they have identified in their opposition,

6    and this is on page 11, the last page of their

7    opposition.  They say, Indeed, such acts operate to

8    prove multiple proper purposes under Rule 404(b),

9    including -- and this is where we get the laundry

10   list -- defendant's planning, preparation, knowledge,

11   and intent to conceal assets to defendant's benefit and

12   to the detriment of creditors and the integrity of the

13   bankruptcy system.  That's the intent that they're

14   arguing in their motion they will demonstrate with these

15   other expenditures.  And that intent, Your Honor, when

16   they had a case that included concealment, that intent

17   might have been an intent -- you ruled it was an intent

18   that was proper, but that intent has nothing to do with

19   the intent to fail to list SVA.  Saying, hey, they --

20   this will show intent to conceal assets.  Concealing

21   assets is itself uncharged.  So what they would be

22   saying is this is -- this shows intent to commit yet

23   another uncharged crime because that's not charged here.

24   It's two layers of intent away.  And they haven't cited

25   any case to suggest that they can introduce 404(b)

1    evidence to prove intent to commit another uncharged

2    crime to some end that's not articulated in this motion.

3    So the intent that they have identified, the intent to

4    defraud they've identified in their motion under 404(b)

5    is not the intent that they're required to prove, and

6    it's not a proper purpose under 404(b).

7              I want to take up the intent to defraud a

8    little bit, Your Honor, if I may.  I know I've been

9    going for a while, we promised you we would take under

10   two hours, and I'm still confident we'll do that very

11   easily.

12             THE COURT:  We have all day if you need it.

13             MR. WASHBURN:  Don't say that, Your Honor,

14   that's dangerous.

15             THE COURT:  Well, it's important that we get

16   these issues resolved and that you know going forward,

17   so take whatever time you need to make sure you fully

18   address the issues.

19             MR. WASHBURN:  Yes, Your Honor.

20             Your Honor, this document is Defense

21   Exhibit 146, and what this is -- in the bankruptcy

22   proceeding this document was filed, as you can see, in

23   late September.  An Unsecured Creditors Committee was

24   formed, and that Unsecured Creditors Committee sent this

25   to Mr. Diehl's attorney and it became a stipulated

1    motion of Mr. Diehl and the Unsecured Creditors

2    Committee in September.  And what -- the importance of

3    this stipulation, Your Honor, is it says -- they

4    stipulate to the entry of an order permitting the

5    Committee's examination of the following entities.  And

6    if you look at this, these are a bunch of entities that

7    show up on the SOFA in response to question 18 and other

8    related entities, and you'll see, because I've

9    highlighted it for you hopefully -- to help hopefully,

10   Skyline Ventures Associates.  So as of September 27th,

11   Skyline Ventures Associates is listed here as what they

12   call -- let me look at Exhibit A -- a closely-held

13   entity.  And the definition of a closely-held entity

14   here on Exhibit A, which I think is around page 5, let's

15   see here, Your Honor, closely-held entity is an entity,

16   I believe, in which he has an interest, or with which

17   he's had a business relationship.

18             And the important part here though, Your

19   Honor, is on page 6 under documents to be produced.  And

20   what you see is that Mr. Diehl stipulated, along with

21   the Unsecured Creditors Committee, to an order requiring

22   him to produce virtually every financial record that you

23   could request from SVA.  I've highlighted items 1, 2, 7,

24   and 10 -- well, as you go through this you see he's

25   agreeing to provide all statements, all cancelled

1   checks, all check registers for any of the closely-held

2   entities -- for any bank accounts in which the debtor or

3   closely-held entities have had any interest or any

4   signatory authority.  So he's agreeing, and he

5   stipulates, Your Honor, that SVA is one of those

6   closely-held entities.  It's on that first page.

7         And if you go to page 5, paragraph 2 it says

8   the closely-held entities means all entities in which

9   debtor has had an equity interest from any time six

10   years preceding the petition to the present, including

11   the following, and Skyline Ventures Associates is listed

12   there.  So as of September 27th of 2012 Mr. Diehl has

13   stipulated that Skyline Ventures Associates is an entity

14   that he controls and that he'll turn over all those bank

15   records.

16         Next, Your Honor, I would like to pass up

17   Exhibit 152.  So Exhibit 152 here, Your Honor, this is a

18   string of e-mails, and I'll represent to you that it

19   starts off, I believe, if you go to page 3 and 4, Engels

20   Tajada, who's a lawyer is now at Holland & Hart, at that

21   point he was at Snell & Wilmer, and he was one of the

22   two lawyers who represented the Unsecured Creditors

23   Committee.  And Jimmy Anderson was a lawyer -- who is a

24   lawyer who now works at Clyde, Snow & Sessions, but at

25   that time was at the firm of Miller Guymon, which no

1   longer exists.  He worked alongside Blake Miller in this

2   case.  What you'll see is that this e-mail chain starts

3   with Mr. Tajada sending a copy of a protective order and

4   that document we just looked at, the 2004 order, the one

5   where SVA is listed as an entity which they'll provide.

6           And the first thing I've highlighted is on

7   page 3 of this, first in time, not first in the paper of

8   this the way these e-mails get printed out, you'll see

9   that Mr. Anderson here on September 26th, so the day

10  before that was actually filed, starts arranging for

11  production of those categories of documents, and I've

12  highlighted it.  He talks about, we're able to produce

13  by this Friday responsive items to ... and then he lists

14  7, 10, 12, 13 and 15.  Those are those paragraphs in

15  that 2004 order that dealt with specific things.  7 I

16  think is the financial statements.  So he's saying,

17  look, we can produce the financial statements by this

18  date, and then produce by October 12th documents

19  responsive to items 1 and 2.  And, importantly, items 1

20  and 2 were those bank statements and records.

21          And then as you go forward a bit, Your

22  Honor, I bring you to the first page because there's

23  some back and forth.  And then on October 2nd

24  Mr. Anderson -- there's back and forth about this

25  production as they're attempting to get documents in

1   place to produce to the Unsecured Creditors Committee.

2   By the way, these are items for all those entities

3   listed on that order in the 2004 order which includes

4   Skyline Ventures Associates.

5            And this last paragraph on page 1 asks for

6   the bank statements.  We have numerous binders of bank

7   statements for the various entities.  And the job is

8   just too big for the debtor and his assistant.  We could

9   have a copy service come and do it if you want at the

10  expense of the Committee.  Do you have a preferred copy

11  company you would like us to work with.  So here's

12  Mr. Diehl -- Mr. Diehl's attorney -- and at this point,

13  Your Honor, if we're -- I think everybody here knows the

14  way these things work.  Mr. Diehl has attorneys who are

15  representing him and they manage the production and they

16  work with him to get these documents.  And here what you

17  have is the attorney saying, look, we have so many

18  binders with so many bank statements, if you want to

19  send a copy company out, tell us who it is and we'll

20  work with them.

21           And Mr. Tajada responds back and says let me

22  look into the company.  So at this point what Mr. Diehl

23  knows is that he has stipulated to an order requiring

24  him to disclose SVA and that his attorney is working

25  with them, and we know his attorney is working with them

1    because some later e-mail chains that I'm not going to

2    go into today show that when they say they have these

3    binders, they're all at Mr. Diehl's home office, and

4    he's just saying, hey, send a copy company up to my home

5    office.  So Mr. Diehl's working with his attorney and

6    saying here they all are, it's a big job, we can't do

7    this much copying, is there somebody -- could she send

8    somebody up to come copy them.  That's on October 2nd.

9           So if we can just stop right there for just

10   a moment, Your Honor, the government -- again, the

11   intent to defraud we're talking about has to be that

12   Mr. Diehl intended to defraud by failing to list SVA on

13   that Statement of Financial Affairs.  But what we see

14   here is by late September Mr. Diehl is disclosing SVA

15   and agreeing to give records.  We looked at 2015.3, Your

16   Honor, that bankruptcy rule, you'll recall that it

17   required that all he needed to disclose was every six

18   months a periodic report that would have listed the

19   profitability, the operations, and something else.  I

20   forget, Your Honor, I apologize.  Here he's agreeing to

21   produce way more than that and he's actively involved in

22   working with his attorney to produce way more than that.

23           And so then you ask yourself, well, wait a

24   second, if that's the case, what do personal

25   expenditures show about Mr. Diehl's intent to defraud?

1   You'll recall here, Your Honor, in this chart that the

2   government has these personal expenditures and they

3   show -- and they, I assume, are attempting to introduce

4   personal expenditures throughout the whole time period

5   to show, hey, Mr. Diehl intended to defraud, not a

6   general intent to defraud by using SVA as a subterfuge,

7   as they claim in their opposition, but the intent to

8   defraud again tacks back to what's actually charged in

9   the Indictment, which is, the intent to defraud by

10  failing to list SVA on the SOFA.

11          If you compare what situation would the

12  creditors have been in, what would have been different

13  on October 2nd when Mr. Anderson was sending this

14  e-mail, what would have been different?  Well, at most,

15  under the law, they would have gotten one of these

16  periodic reports of SVA.  And other than that, Your

17  Honor, the answer is basically nothing.  The

18  creditors -- so if you're sitting there on October 3rd,

19  there is no difference between the amount of information

20  a creditor had on October 3rd in a world in which

21  hypothetically Mr. Diehl puts SVA on that SOFA versus

22  the actual historical world of what happened, no

23  difference whatsoever.

24          What's important to note here, Your Honor,

25  what the evidence will end up showing is on that 2004

order all of those entities that had listed SVA on, the
unsecured creditors hadn't received records for any of
them up to that point.  So these productions that
Mr. Anderson is talking about in this e-mail with
Mr. Tajada, that's the first time that there was any
production to the unsecured creditors.  So it's not even
as if they would have gotten -- if you compare SVG which
was listed on the SOFA to SVG (sic) which was not, the
creditors got the same category of documents at the same
time as they would have gotten.

Now, this is the point, Your Honor, where I
make what may look like a little bit of a perverse
point, which is this:  The government claims, or has
evidence of, personal expenditures from April all the
way through confirmation and beyond through SVA.  But
that undermines their theory that those personal
expenditures show that Mr. Diehl was intending to
defraud by not disclosing SVA on the SOFA.  How does it
undermine it?  On October 3rd, just to pick the date
after this e-mail, Mr. Diehl knows that he has an
obligation to turn over those bank records, is actively
cooperating with his attorney to turn over bank
statements of SVA, the bank statements that will form
the exact same basis of these personal expenditures that
the government wants to introduce to show his intent to

1    defraud.  And what does he do?  Does he all of a sudden

2    stop and say, uh-oh, now that I've got -- now that SVA

3    is out there, I better not do personal expenditures

4    through SVA anymore.  No.  Those personal expenditures,

5    according to their chart, continue.  What does that tell

6    us for present purposes?  That they're irrelevant to his

7    intent to defraud by hiding SVA.  If he's making

8    personal expenditures through SVA, is their theory,

9    after SVA's been fully disclosed, it's obvious that they

10   don't demonstrate some sort of motive to hide SVA.  He

11   makes personal expenditures before SVA is disclosed, he

12   makes personal expenditures after SVA is disclosed.

13   Those personal expenditures don't show anything about an

14   intent to hide SVA.  They may show something about an

15   intent to fail to report those concealed assets which

16   were in the original Superseding Indictment, but they

17   don't show anything about the charges in this

18   Indictment.

19           I kept trying to think about a good analogy,

20   and maybe this one's not going to be productive at all,

21   but the analysis is a kid is saying I don't want my mom

22   in the car, and you think, well, he doesn't want his mom

23   in the car because he's going to speed, and then his mom

24   gets in the car and he speeds anyway.  Well, maybe he

25   just didn't want his mom in the car because she doesn't

1    like the same radio station.  It's not because he's

2    trying to hide the speeding.  And that's what's going on

3    here, Your Honor.  These personal expenditures do

4    nothing to show Mr. Diehl's intent to defraud by failing

5    to disclose SVA.  A different -- if we were on a

6    different indictment, Your Honor, and maybe even if we

7    were on this Superseding Indictment instead of a Third

8    Superseding Indictment, that's a different analysis, and

9    that's why we brought this motion because the intent to

10   defraud here is very different than the intent to

11   defraud in a different context.

12          Your Honor, I want to pass up now

13   Exhibit 156.  Your Honor, I think this is one of those

14   exhibits where we probably need to talk to the

15   government because they have a version of it and we have

16   a version of it.  This is an excerpt.  Mr. Diehl, two

17   days after that October 2nd date, sat for a 2004 exam.

18   And in our motion we cited some parts of the 2004 exam

19   that we thought were relevant, and then the government

20   cited some parts that they thought were relevant.  They

21   talked a little bit about the million dollars, and we

22   can talk about that.  I wanted to pass this up to you,

23   Your Honor, because I think seeing -- this is the

24   section where SVA gets discussed.  There's a bunch of

25   pages before this where they talk about other entities,

1  but then you can see starting on page 76, they're

2  looking -- by the way, when they say it's not on here,

3  they're looking at a chart that I believe Mr. Diehl's

4  assistant prepared for a 341 hearing, and it's an

5  exhibit to this, I didn't put it on here, but they're

6  looking at a chart.  And the attorney for the Unsecured

7  Creditors Committee says, hey, what's this Skyline

8  Ventures Associates?

9         Mr. Diehl says, It's an entity owned by my

10  daughters, and, you know, 50 percent by each of my

11  daughters.  And we set it up in anticipating possibly

12  doing some developing in the future, and it currently

13  doesn't have any projects, it doesn't own any projects.

14         And then it -- starting on page 78 it says,

15  you know, the Unsecured Creditors Committee clearly saw

16  exactly what I was talking about because on page 78 it

17  says, Okay.  Skyline Ventures right now, according to

18  the monthly reports that you've been filing, has been

19  making payments to you; is that correct?

20         And he says, That's correct.

21         This is important for a couple of reasons,

22  Your Honor.  First of all, like I said, SVA wasn't

23  hidden, it wasn't listed on the SOFA, but SVA was never

24  hidden.  It was disclosed exactly where the Unsecured

25  Creditors Committee saw it, which was the monthly

1    operating reports that listed it as the income.  And, as
2    I said, if you look through all of the monthly operating
3    reports during the pendency before the confirmation of
4    the plan, SVA isn't just a source of income, it's the
5    source of 96 percent of the income.  So the Unsecured
6    Creditors Committee here is saying, hey, we saw that,
7    they're making payments to you, right?  What are those
8    payments for?
9              Consulting work.
10             And if I can skip to the middle of page 79,
11   it says, When you say consulting, then you mean the same
12   services you were providing through your business before
13   you stopped doing work through Wasatch Pacific.  So here
14   the Unsecured Creditors Committee is saying, look, this
15   entity that's owned by -- this is what the unsecured
16   creditors are saying, this entity that's owned by your
17   daughters that wasn't on the SOFA, but here we are
18   asking about it, what's it doing?  And he discloses
19   exactly what it's doing.  It's doing the same things.
20   He says yes to that, the same services you were
21   providing through your business before you stopped
22   through Wasatch Pacific.  So, in other words, they know
23   that this is the new iteration of Wasatch Pacific and
24   they know Wasatch Pacific was the business Mr. Diehl ran
25   all of his business through.

1              He said, Yes.  I guess -- when you say

2      providing, I always did this stuff.  I did it for

3      myself.  I didn't do it for other people.  And now I'm

4      doing some of the consulting work, you know, for other

5      people and getting paid for that.

6              And then they ask, Who are you doing that

7      for?

8              And he says, The project that's paid in the

9      last six months has been a development by the name of

10     Draper Holdings.

11             When we were here last time there was a

12     check that Mr. Hirata held up which was an $80,000 check

13     in about July from a company called Boulder Ventures to

14     Skyline Ventures Associates that was one of the charged

15     counts of hidden in an undisclosed payments into Skyline

16     Ventures Associates.  And here he is in his 2004 exam

17     saying none of those guys have been paying me.  Draper

18     Holdings and Boulder Ventures Associates, the same

19     owner.  Boulder Ventures is a holding company.  Draper

20     Holdings is a subsidiary.  And they say, Okay.

21             It's transferring the development out there

22     that I've been taking all the heat in the paper about

23     conflicts of interest down in Draper.  But, anyway, it's

24     the developer in that that's paying me consulting fees.

25             And they ask, And they pay it to Skyline

1    Ventures?

2            And he says, Yes.

3            Skipping ahead a little bit because if you

4    can turn to page 88 he discloses more about what Skyline

5    Ventures is.  And what did your daughters invest in

6    Skyline Ventures?  What did they do to obtain 49

7    percent -- or 50/50?  What did they do for their 50/50

8    shares?  What have they contributed?

9            They contributed some of their time, but we

10   really haven't started to do anything.  My bankruptcy

11   kind of happened and my daughter was going to move from

12   Dallas to here, maybe set up an office.  Stopped her

13   from doing that when I filed bankruptcy.  So I'm waiting

14   to sort all of this out.

15           Skyline Ventures is housed out of your home?

16           Yes.

17           On the next page.  Now, Kim is your

18   assistant at Wasatch Pacific.  Does she work for Skyline

19   Ventures?

20           Yes.

21           It's basically the same company just

22   continued under a different name?

23           No.  We're actually trying to do some new

24   work.  There really isn't too much to do on the other

25   stuff, that is the prior projects, because it's just

1    sitting.

2              And then this is another important point

3    here, Your Honor.  On page 90, All right.  Tell me

4    generally, how do you plan to propose a plan?

5              Your Honor, the government has in the past

6    said, oh, look, when you said no, we really haven't

7    started anything with Skyline Ventures Associates, what

8    they're talking about here is his plan to get things

9    going.  He does describe, Your Honor, that if Skyline

10   Ventures Associates he says -- he's doing -- if you go

11   back to page 79, he says, You know, we're working on

12   several projects right now, but like I tried to tell you

13   yesterday -- the billing records will show that there

14   was a phone call that wasn't recorded between the

15   Unsecured Creditors Committee lawyers and Mr. Diehl and

16   his attorney -- when I talked to you, it takes a couple

17   of years before you really generate any cash flow from a

18   project because there's a lot of work to do.  And that

19   makes sense.  These are big developments.  He says, so

20   while we're in that phase we're out there trying to find

21   some things that I can do consulting-wise to try to

22   bring in some income and keep us afloat.  So he

23   described earlier, Your Honor, that he's in the phase of

24   let's try and keep us afloat, and here he's talking

25   about, well, what projects do you have.  And Mr. Tajada

1   asked him, Tell me generally how do you propose a plan,

2   how do you plan to propose a plan?  This is the very

3   first part, Mr. Tajada is saying what are you doing

4   here?  You've got this Chapter 11, what are we doing

5   here?  Well, if in fact we can be successful in

6   eliminating a large portion of the debt that's on here,

7   my plan would be to try and formulate a plan over the

8   next five years where we would pay everything back.  We

9   would have to do that based on a percentage of income

10  that I bring in.

11          And then asked, Okay.  You don't have any

12  other employment other than working for Skyline right

13  now; is that right?

14          That's correct.

15          So now they know that he's only working for

16  Skyline Ventures Associates.

17          And if you go two more pages ahead,

18  question -- and this is on line 6, page 93 -- The source

19  of your plan now would be -- I'm sorry, what was the

20  source of the plan payments?

21          Same thing.  I had to go out and do

22  development of projects.  The same thing as he had

23  declared bankruptcy back in the '90s and they asked how

24  he paid it off then.

25          Okay.  Is there any property that you would

1    liquidate to fund your plan?

2                No.  We do all new projects that are outside

3    of these.

4                So they would all be for new service, right?

5                Yes.

6                Would you do the projects under the existing

7    companies or under the new companies?

8                We would -- right now my thinking is that we

9    would manage it under Skyline, but we would be no

10   different than we had done here.  We acquire a piece of

11   property, another LLC would be set up in order to hold

12   that, and the interest would be held, depending on how

13   we funded it.

14               And he says, Okay.

15               And then he says, I don't think we would do

16   it any different that we've done in the past.

17               I apologize, somehow I've contrived to

18   misplace my outline.  Your Honor, I went through all of

19   that because, again, the question is you have these

20   personal expenditures.  After he disclosed all of that

21   about SVA, they know it's his only employer, they know

22   it's the entity he's going to use to pay off the plan.

23   And the government's theory seems to be that somehow or

24   another he thinks he's hiding things in SVA.  If this

25   were a case where there were another entity called, you

1   know, Skyline Group Associates and all of the personal

2   expenditures went through that, but Skyline Ventures

3   Associates was what he told the Creditors Committee

4   about, I get how failure to list the Skyline Group

5   Associates might be relevant to some sort of intent.

6   Here, Your Honor, in this case, all of these personal

7   expenditures are not relevant at all to show his intent

8   when he listed on the SOFA said he didn't report SVA.

9            Your Honor, there's a qualitative difference

10  between everything he did list on the SOFA and SVA,

11  which he did not, and that is, he didn't have on paper

12  any ownership interest in SVA.  As it's noted, his

13  daughters owned it 50/50.  And the government's theory

14  is, well, he was a managing executive of it.  And,

15  again, we have to ask what do these later personal

16  expenditures far down the road have to do with showing

17  that he intended to defraud by failing to list SVA when

18  he was a managing executive of it.  And they haven't

19  articulated that.  Instead, what they argued, what the

20  intent to defraud would show is this general subterfuge

21  intent to defraud, you know, hiding things from

22  creditors.  And, again, that's not charged in this

23  Indictment.  So the intent that they've articulated they

24  plan to prove is not at all what's charged in the

25  Indictment.

1              Again, I think it's worth comparing, and I

2    may be belaboring the comparison, between the prior

3    Indictment and your ruling on that prior Indictment and

4    why we think the ruling should be different here.  In a

5    prior Indictment they alleged as a concealment and a

6    false statement that there was a $50,000 transaction

7    that came in on December 23rd.  And if you're alleging,

8    okay, on December 23rd a $50,000 transaction comes in,

9    and then we want to show expenditures.  That makes a

10   certain amount of sense.  You say, okay, if you're

11   alleging that he concealed that 50,000 and he spends it

12   on a whole -- he doesn't report it and he spends it on a

13   whole bunch of things, all right, that makes a certain

14   amount of sense.  If the allegation is, hey, at some

15   point long before failed to disclose SVA on a SOFA

16   and -- but shows up all sorts of other places, that

17   personal expenditure doesn't have probative value to

18   that intent.  The way that it might have probative value

19   to the intent to conceal the asset or fail to disclose

20   in those charges that were in the Indictment but no

21   longer are.

22              Your Honor, the government seems to from

23   time to time -- it's in every iteration of the

24   Indictment, Mr. Hirata said it during his argument last

25   time, get up and say the price of bankruptcy is full

 1    disclosure.  And it actually isn't.  It's compliance

 2    with the rules.  And I think that's important because a

 3    lot of the things that -- for example, the government

 4    had one exhibit to their opposition, and it was a list

 5    from that same document where there were questions about

 6    Skyline Ventures Associates.  And in that they ask, hey,

 7    we see your income of $376,000.  What is -- what was the

 8    source of that income that you made in 2011?  And

 9    Mr. Diehl said, I can't tell you that, you would have to

10    ask Brent that.  Brent being Brent Daines, his

11    accountant.  He had been identified earlier.

12             And the government says, look at that, he's

13    deflecting, I think deflecting is the word they use,

14    deflecting what's the source of that income.

15             First of all, Your Honor, it's a little bit

16    hypocritical of the government.  We've now had three --

17    when we started off, the first tax count, and the tax

18    count asked -- said that there was tax due and owing on

19    Mr. Diehl's tax return for 2011, the evasion count

20    that's just been dropped out.  And you'll recall that

21    the first iteration of that said there's tax due and

22    owing of 300,000.  And then they interlineated it down

23    to 190,000.  And then they dismissed it.  And it's my

24    understanding the reason they dismissed that evasion

25    count is because they couldn't prove tax due and owing

1    because they couldn't prove, as you look at all the

2    records, what Mr. Diehl's income is for 2011.  So if the

3    IRS revenue agent who is assisting in the prosecution

4    team, who has as much time, presumably, as they need to

5    look at these documents before they make the monumental

6    decision to indict Mr. Diehl on tax evasion, can't get

7    it right and can't get it right two different times, the

8    fact that they are saying that Mr. Diehl is deflecting

9    by saying, gee, I don't know, ask my accountant feels to

10   me hypocritical.  But more to the point, Your Honor,

11   it's honest.

12          I'm going to show you a document, this is a

13   Government Exhibit 12-15.  And this is an e-mail chain

14   on April 12th.  The SOFA was filed on April 13th.  And

15   just to identify everybody who participated in it,

16   there's someone named Kim Iba.  Kim has a bunch of

17   different last names that you'll see in the record.

18   There's Kim Iba, Kim Monroe, Kim Arcade, that's all the

19   same person.  Kim Iba is what she was going by at this

20   time.  She was Mr. Diehl's personal assistant.  And we

21   read a little bit ago that she worked out of his home

22   office.  There's Brent Daines, that was Mr. Diehl's CPA.

23   And you'll notice all of those e-mails are between those

24   two and they're cc'g Mr. Diehl.  And the e-mails are

25   Ms. Iba on April 12th sends a document saying e-mailing

1    profit and loss statements.  Please look these over.

2            And then Mr. Daines responds, looks better

3    on the income side.  Reprint the income statement and

4    collapse the account to not show the sub-accounts.

5    Let's see if that cleans it up.

6            And then Ms. Iba says, Yep, shows some

7    income.  However, in 2010 shows a huge net income, and

8    the tax return shows a deficit of 659.

9            So what you see here is Mr. Diehl's

10   bookkeeper -- I call her an assistant, but she's a

11   bookkeeper.  She does significant amounts of

12   bookkeeping.  We've exhibited her CV.  I didn't bring it

13   to show it to you, but that's who she is.  So the

14   bookkeeper and the CPA are going back and forth with

15   financial statements.  And you saw that the CPA gave

16   some specific directions on how to present those

17   financial statements.

18           And then if you look at a couple of pages

19   back here, Your Honor, I think it's the fourth page

20   back, you have a profit and loss statement for 2011,

21   dated April 12, 2012.  This was the attachment that

22   Ms. Monroe shared.  And it says 376,706.83.  Now, what

23   shows up on the SOFA is 376,708.83, I think.  I think

24   there's a $2 transcription error between this document

25   and the SOFA.  But that's the number.  And so when

1    Mr. Diehl says when he's asked, hey, where did that

2    income come from, and he says, I can't tell you, you'd

3    have to ask Brent, my accountant, he's saying that

4    because Brent, his accountant, is the one who came up

5    with it.  And when you say, I can't tell you, again,

6    Your Honor, that hypocrisy of the government in their

7    opposition saying that's him deflecting, when they

8    themselves spent months and couldn't come up with an

9    accurate income number is pretty astounding.  Mr. Diehl

10   gave them an honest answer to that.

11              And, Your Honor, also I would note, just as

12   an aside, the false statement that they allege in kind

13   of the prong -- the first prong of Count 1, that million

14   dollars that failed to be reported, the income that

15   needs to be reported, this is the same year, same year

16   as his tax return for 2011.  The government just

17   dismissed the evasion count, I assume, because they

18   can't prove Mr. Diehl had tax due and owing, and I

19   assume because they couldn't prove he had tax due and

20   owing because he didn't have income.  And the thing he's

21   asked to report is gross income.  And here we have -- he

22   reports whatever his accountant gave, this 376.  I'll

23   just be interested to see what the government's theory

24   is on his income if they couldn't show tax due and owing

25   because he didn't have income for 2011 for tax purposes.

1   Showing that Mr. Diehl was attempting go defraud by

2   failing to report this million dollars or by reporting

3   the 376, Your Honor, I think just shows again that

4   there's kind of a lack of clear understanding of intent

5   to defraud.

6           Your Honor, I've been talking quite awhile,

7   just to reiterate what I think are the most important

8   points:  This is a very narrow case.  It may have a

9   really broad theory behind it, but that's not what we

10  judge 404(b) by.  You won't find 404(b) cases that say,

11  hey, this is relevant to show intent to defraud of their

12  theory, uncharged theory.  What you'll see is is this

13  relevant to prove an element of the charged crimes.  And

14  here the only charges, the only charge that I think is

15  relevant to -- that they intend to offer these personal

16  expenditures for is an intent to defraud by failing to

17  list SVA on that SOFA.  That's it.  It's not this broad

18  free-ranging intent to defraud.  It's not the same

19  intent to defraud we have with the concealment and false

20  statement case of -- false statement being failing to

21  list specific income items during the time period

22  contemporaneous with those personal expenditures.

23          Obviously, Your Honor, if you have any

24  questions now, I'm happy to take them.

25          THE COURT:  Taking your arguments and

1    putting them in concrete terms that we can apply, under

2    your argument what -- how would we characterize, how

3    would we describe the evidence you believe should be

4    excluded?  Categorize them in --

5         MR. WASHBURN:  First of all, Your Honor, I

6    would say that any -- that expenditures out of SVA that

7    are not charged in the Indictment are other acts.  And I

8    think all of the -- what we asked for in our original

9    motion was that it be excluded evidence that Mr. Diehl

10   made personal expenditures out of Skyline Ventures

11   Associates.  And we also ask that it be excluded this

12   use of an American Express card that was paid by SVA.

13   So that's what we would ask to be excluded is those

14   personal expenditures.

15        I apologize, I told you I was done, but I

16   want to make one last point, and that's the 403 point,

17   if I may.  Your Honor, what we've been hearing over the

18   last few days is that the government has -- is serving

19   new witnesses, they're amending their witness list to

20   add a whole bunch of additional witnesses.  Those

21   additional witnesses apparently are here to testify

22   solely about these personal expenditures.  They're going

23   to bring people in, Mr. Diehl's ex-wife, Mr. Diehl's

24   ex-wife's brother-in-law to talk about, oh, Mr. Diehl

25   paid for my family to take a flight on the X, or he paid

1   for this or that or the other.  I would estimate that a

2   third of the witnesses that we're going to hear from are

3   going to have some -- are primarily going to be just to

4   talk about these personal expenditures.  And that's the

5   sort of distraction from -- you know, we're going to

6   have this jury hearing -- if we let this in, all of a

7   sudden we're going to have Mr. Diehl's ex-wife come in

8   and say, yep, Mr. Diehl bought me this necklace and it

9   came out of SVA.  And what does that have to do with the

10   decision this jury is going to be asked to make, which

11   is, should Mr. Diehl have listed SVA on his SOFA.  And

12   all of a sudden you've got his ex-wife saying, yeah, he

13   bought a necklace for me at Christmas 2012.  That's the

14   nature of the evidence that the government, as I

15   understand it, and I -- obviously I'm not -- I may be

16   mischaracterizing it, I'm not doing that intentionally,

17   but that's my understanding is they're intending to call

18   a series of witnesses to do nothing but that.  And under

19   403, even if this were -- it had some probative value to

20   that intent of what was going through his head back in

21   April 2012, and I don't think it does, but even if it

22   did, the possibility of confusing the issue, the

23   possibility that the jury will hear that and say, wow,

24   he's spent all this personal money out of SVA, that

25   sounds wrong, and not connect that to, wait a second,

1     that's not the question I'm being asked to consider.

2     I'm being asked to consider did he act as an intent to

3     defraud when he failed to list SVA on the SOFA, a very

4     narrow question.  I think the risk of confusion is high

5     under Rule 403.

6                    THE COURT:  Thank you.

7                    MR. WASHBURN:  Thank you, Your Honor.

8                    THE COURT:  Mr. Hirata.

9                    MR. HIRATA:  Pardon me, Your Honor, I just

10    want to get some water.

11                   THE COURT:  Sure, go ahead.

12                   MR. HIRATA:  Judge, the United States'

13    theory has not changed.  It's very clear, it's been

14    stated throughout all the Indictments in this case, that

15    the defendant created and used SVA as a subterfuge to

16    funnel and spend money throughout the plan confirmation

17    period, disclosing some, not other funds, and as to

18    undisclosed funds using them for personal expenses.

19                   Your Honor, the -- what ties together all of

20    the evidence that Mr. Washburn has pointed to from his

21    side of the case, and that would include bankruptcy

22    filings, 2004 examinations, all of those items pertain

23    to intent, intent.  And intent is a fundamental element

24    under 152 sub (3), false declaration.  And that's really

25    what's at issue here.  What was in Terry Diehl's head at

1   the time he filed on April 13, 2012, the statement of

2   financial disclosures and responding to question 18 and

3   not identifying Skyline Ventures Associates, Inc.  So

4   how do we ascertain intent?

5           THE COURT:  Let me stop you for just a

6   moment.  What is the intent that the government is

7   required to prove?

8           MR. HIRATA:  It's the intent not to list SVA

9   in response to question 18.  Did he act with fraudulent

10  intent when --

11          THE COURT:  That's the part I want you to

12  focus on, the fraudulent intent part.

13          MR. HIRATA:  Okay, and I'll do that.  And

14  let me quote from *Huddleston* as a starting point.

15  Extrinsic evidence may be critical to the establishment

16  of the truth as to a disputed issue, especially when

17  that issue involves the actor's state of mind and the

18  only means of ascertaining that mental state is by

19  drawing inferences from -- okay.

20          So with regard to that fraudulent intent in

21  not disclosing SVA in answer to question 18, you have to

22  consider, as *Huddleston* notes, circumstantial evidence.

23  That would include, as we've alleged in the Indictment,

24  the creation of SVA, not in his name, but in the names

25  of his daughters.  You would also need to note prior to,

1    again, the submission, the failure to disclose that a

2    bank account is opened in the name of SVA.  He's not a

3    signer on that account.  You would also need to note,

4    and this all bears upon his intent not to disclose, his

5    managing up to the point of that filing, SVA running its

6    day-to-day affairs, managing all of the money that goes

7    into that account.  It's not his daughters'.  They have

8    no hand in the business.  And that's the evidence you'll

9    hear at trial.  But it's Terry Diehl and Terry Diehl

10   only managing the business, managing the money in,

11   managing the money out.

12           THE COURT:  I don't understand the defense

13   to be arguing that that's precluded.  That goes to

14   whether or not he was a managing executive.

15           MR. HIRATA:  Correct.

16           THE COURT:  Okay.

17           MR. HIRATA:  Right.

18           THE COURT:  Go ahead.

19           MR. HIRATA:  Okay.  And in addition to that,

20   Judge, that he's the managing executive, it's important

21   to note this:  Not only was he the managing executive of

22   SVA, he was SVA.  There was nobody else involved in the

23   business, there was -- it's not as though, as

24   Mr. Washburn stated very early in his argument, he

25   called -- he noted that the defendant recognized SVA's,

1    quote, "his employer."  That's misleading.  He was SVA.

2           THE COURT:  Well, but that goes to questions

3    of piercing the corporate veil.  Are we going to have a

4    trial about whether or not he disregarded the corporate

5    formalities, whether or not he treated this as a

6    separate entity?

7           MR. HIRATA:  No --

8           THE COURT:  Because if you say he was SVA,

9    that's the same as saying SVA is not entitled to legal

10    recognition.

11           MR. HIRATA:  And I don't mean to say that

12    when I say he's SVA.  What I do mean to say is that he

13    and only he was in full control.

14           THE COURT:  Okay.  That goes to whether he's

15    the managing executive.

16           MR. HIRATA:  That's right.

17           THE COURT:  I get that part.

18           MR. HIRATA:  Okay.  That's the managing

19    executive.  Okay.

20           So that evidence is relevant to his intent.

21    The events and circumstances leading up to that filing

22    wherein he failed to disclose SVA.

23           Additionally, what else goes to his intent,

24    what other circumstantial evidence bears upon his intent

25    when he knowingly and intentionally failed to disclose

1   SVA?  We will put on evidence that following the filing,
2   following the filing he ran money, again, under his full
3   control as the managing executive, through SVA,
4   disclosed only some of that on monthly operating
5   reports, and to the extent he didn't disclose, he used
6   some of that money for personal expenses.  That also
7   bears upon his failure to note SVA and fully disclose,
8   and I'll get to full disclosure here in just a bit.
9              THE COURT:  Let me make sure I understand
10  what you're arguing.  It would be the intent of the
11  government to offer that more money was earned in SVA
12  than was reported on the monthly operating report.  So,
13  for example, they reported $10,000, I don't know if
14  that's the particular instance, but in concept it would
15  be, well, they really earned 15,000, only 10,000 got
16  reported, and the 5,000 was used for personal
17  expenditures.
18             MR. HIRATA:  Some of it, yes.  That's the
19  theory, that's the argument.
20             THE COURT:  I want to make sure that I'm
21  tracking your argument.
22             MR. HIRATA:  Okay, fair enough.  That
23  occurred, the evidence will show, for I believe it's 11
24  out of the 13 monthly operating reports that were filed.
25  There was undisclosed funds -- there were undisclosed

1   funds, some of which were used for personal expenses

2   that creditors were completely unaware of.

3          So what additional acts following the filing

4   of the petition are relevant to his intent?  The

5   statements that Mr. Washburn alluded to in the 2004

6   examination, it's the government's position that there

7   wasn't full disclosure there.  He did not inform them in

8   plain terms that it's his business that he exclusively

9   manages and controls, controls all the money coming in

10  and going out of SVA.

11         THE COURT:  What does that have to do with

12  the disclosure in the SOFA, as Mr. Washburn calls it?

13         MR. HIRATA:  He purposely didn't disclose in

14  the SOFA SVA because --

15         THE COURT:  That's the charge, that is the

16  charge.

17         MR. HIRATA:  That's the charge.  He

18  purposely didn't disclose because that gave him the

19  opportunity to portray SVA in a different manner,

20  something other than what it actually was, that is, him

21  being the managing executive over which he had full

22  control.  And I'll give you an example.

23         THE COURT:  Let me make sure I understand

24  your argument.  So assuming that he had disclosed SVA in

25  the Statement of Financial Affairs, how would that have

1    changed anything that came subsequently?  How did his

2    failure to disclose change in any way his interactions

3    with the Creditors Committee and their attorneys?

4              MR. HIRATA:  Because at that point they

5    would know that it's actually his company that he's

6    managing, and so when they see these payments coming

7    from Skyline Ventures Associates to him, it would raise

8    a question, well, now wait a minute, so he's paying

9    himself?  That doesn't make sense, right?  And so that's

10   where he would run into problems and issues.  And

11   that's, again, Your Honor, that's the government's

12   theory here is that he purposefully failed to disclose

13   SVA on the front end so that he could control the

14   narrative going forward as to what SVA was, which at the

15   end of the day was something less than what it actually

16   was in operation and as the evidence will come out at

17   trial.

18             Again, Your Honor, if you look at the

19   monthly operating reports, it shows payments going to

20   him in the form of consulting fees from Skyline Ventures

21   Associates.  I believe there are a series of checks.

22   And that's what Kim Iba, his bookkeeper, will testify

23   to, that every month they get together, she and the

24   defendant, to ascertain, all right, so what expenses are

25   we going to pay this month.  He would then, based upon

the total expenses that they were set to pay, would

dictate to her the number of checks to write out on the

SVA account to himself that he was going to characterize

as consulting fees, and those payments, those checks,

added up to expenses for that month.  That was not an

accurate picture of what occurred month-by-month.  And,

in fact, there was additional money being received into

SVA not disclosed to creditors and the bankruptcy court,

and that money was used in part for personal expenses.

That's all relevant.  Again, Your Honor, by not

disclosing SVA up front, he gets to control what we

believe, and our position is, a misleading narrative

relative to what SVA actually is.  It's something other

than what it is.

The 2004 examination, if I may get back to

it, yes, he's asked questions about SVA, but he never

fully tells it straight up what it is.  Right?  That

it's his business that he exclusively manages and

controls.

THE COURT:  So under your theory of the

case, what is it that he should have disclosed in the

debtor's examination that he didn't disclose?

MR. HIRATA:  What I just said, Judge, that

it's his business that he exclusively manages and

controls.  Why?  Because that is wholly inconsistent

1    with what he's put on monthly operating reports to date.

2    And so Engels Tajada, who was taking the examination,

3    and Troy Aramburu, who was sitting in on the

4    examination, both lawyers to the Creditors Committee, if

5    they learn the true circumstances, then they have good

6    questions to question the operating reports, because

7    it's all of a sudden, well, now we're really confused

8    because Skyline Ventures Associates, as you've portrayed

9    it in these reports, is something -- is some separate

10   company that's paying you a consulting fee wherein at

11   the end of the day in reality it's your company, you're

12   in full control of it, you're in control of all the

13   money going in and out of it.  And, by the way, here's

14   another thing he's not disclosing that the money that is

15   going in and out is not fully being reported on those

16   monthly operating reports.  He doesn't even disclose

17   that.

18              THE COURT:  Mr. Washburn represents that the

19   Creditors Committee had all of the bank statements.  If

20   they had the bank statements, that shows all of the

21   money that was -- are you arguing that there was money

22   that was going into bank statements that were not

23   disclosed?

24              MR. HIRATA:  No.  But I will say this:  What

25   Mr. Washburn has raised is a factual question, because

1    the government will be putting on evidence of the

2    creditors, in particular the lawyers for the Creditors

3    Committee, not being necessarily -- let me back up.

4    That argument, Judge, goes to the argument of what the

5    Creditors Committee should have known, right?  So

6    that -- he's saying, hey, all of these records are

7    available, and for whatever reason they didn't either

8    look at them, or they looked at them but didn't pick up

9    on what they should have picked up on, therefore there

10   was full disclosure.  Well, Your Honor, the United

11   States' point is this:  The jury is entitled to consider

12   all of the evidence that's occurring during this same

13   period, so they can consider the stipulation that

14   Mr. Washburn referred to, the 2004 examination, but they

15   should also be able to consider the monthly operating

16   reports and the money that's coming in and out and

17   what's not being reported.  All of that, at least in the

18   United States' view, is relevant to fraudulent intent.

19   It strikes me, Your Honor, that the defense can't have

20   it both ways, to keep out all of this evidence following

21   the filing of the SOFA and to then cherry pick whatever

22   evidence they see fit in an effort to defeat the

23   critical element of fraudulent intent.  The jury is

24   entitled to all of that evidence so that it can make in

25   its wisdom a determination as to whether the government

1    has met its burden as to fraudulent intent.

2           He also noted that what does acts of

3    concealment have to do with this?  Acts of concealment,

4    Your Honor, go directly to fraudulent intent.  Again,

5    you can look at -- again, goes to his motive in failing

6    to report SVA on the front end.  It goes to his motive

7    in, again, controlling the narrative as SVA means

8    something other than what it actually was.  Acts of

9    concealment also bear upon that because, again, acts of

10   concealment bear upon the controlled narrative that it's

11   something less than what it actually was, as portrayed

12   by defendant.  All of that evidence is relevant for the

13   jury's consideration as to that key element.

14           THE COURT:  What is the government's

15   contention of the period of time for which that evidence

16   is relevant?

17           MR. HIRATA:  From -- so from the filing of

18   that Statement of Financial Affairs --

19           THE COURT:  What about before, what about

20   before the filing of the Statement of Financial Affairs?

21           MR. HIRATA:  Oh, yes.  As I noted, again,

22   it's the steps that he took to set up SVA, that's

23   important, that's relevant because that also goes to his

24   intent.  And if he's not putting his name on

25   registration papers, if he's not putting his name on the

1   bank statements, all of that is relevant to his intent

2   not to disclose on the SOFA.

3           THE COURT:  So basically from the creation

4   of SVA through what date?

5           MR. HIRATA:  The end date, we would submit,

6   is when the plan is confirmed.  Because it's up to that

7   entire point that he continues to control the narrative

8   filing monthly operating reports, not fully disclosing.

9   As to what he's not fully disclosing, he is using for

10  personal expenses, personal expenses.

11          THE COURT:  Okay.

12          MR. HIRATA:  That's the relevance of the

13  personal expense, that's the relevance of the American

14  Express expenses.  We're not trying to, for lack of a

15  better description, dirty up Mr. Diehl by showing these

16  discreet personal expenses.  But all we're trying to do

17  is prove them up, it's just that.  That's our burden.

18  And if we are deprived of calling his ex-wife,

19  brother-in-law, vendors, admitting business records to

20  show that these are, in fact, personal expenses, then

21  that deprives us of the ability to again prove up the

22  critical element of fraudulent intent.

23          I believe that's our position, Your Honor.

24          THE COURT:  Mr. Washburn, do you wish to

25  respond?

1          MR. WASHBURN:  Yes, Your Honor.  The reason

2    I started where I started with what the implications of

3    listing SVA on the SOFA were is to demonstrate that

4    Mr. Hirata talks about setting a different narrative in

5    all of this.  Listing it on the SOFA lists Skyline

6    Ventures Associates, Inc., it lists an address, and

7    that's about it.  And then you have these operating

8    reports that I talked about that would have been

9    triggered, and then -- and that's it.

10          And when we look at the 2004 order, Your

11   Honor, by the time of the 2004 order that -- the time

12   for a second operating report wouldn't have come.  So

13   you have a 2004 order, what does it say?  It says

14   Skyline Ventures Associates is a closely-held entity of

15   Mr. Diehl.  So when Mr. Hirata says, oh, he gets to set

16   a narrative in the 2004 exam, I have no idea what he's

17   talking about.  It's not as if when you list something

18   in the Statement of Financial Affairs in response to

19   question 18 you have to write an essay about who it is,

20   what it does, or anything else.  You just list its name

21   and address.  There is no narrative, Your Honor, to

22   listing it or not listing it.

23          Mr. Hirata mentioned, I think this is an

24   important part here, mentioned a 2004 exam, and you

25   asked him what ought he to have disclosed that he

1  didn't, and Mr. Hirata listed some things.  I don't know
2  how many depositions he takes.  I'm not a big deposition
3  guy, Your Honor, I'm mostly criminal.  I get into them
4  from time to time.  And the number one instruction that
5  you give to a deponent is listen to the question and
6  answer it.  And so when Mr. Hirata says, well, he should
7  have disclosed this and he should have disclosed that,
8  what he doesn't show you, because it doesn't exist, is a
9  question that Mr. Diehl didn't answer honestly.  They
10 say he should have disclosed it.  I guess what they're
11 saying is they should have asked a question and he
12 should have answered it.  A 2004 exam isn't where you
13 come in and make a debtor -- you come in and say what's
14 everything that you would want to know if you were us,
15 spill the beans.  I suppose you could ask that as the
16 first question.  It might draw an objection.  But that
17 didn't happen here.  And so when they say, hey, he
18 should have disclosed X, Y or Z.
19          You asked, Your Honor, I think it's the key
20 question here, you know, what would have been different,
21 because when you asked him the timeframe, when you asked
22 Mr. Hirata the timeframe, what timeframe do you think is
23 relevant, after the point on that 2004 order where SVA
24 is disclosed, certainly after that point.  I think
25 honestly, Your Honor, before that point as well.  But

1    the fact that the government is saying the personal

2    expenditures that occur after that point are evidence of

3    his intent not to disclose SVA on the SOFA makes no

4    sense to me.  It's been disclosed as a closely-held

5    entity.  It's been a subject of whatever questions

6    Mr. Tajada and Mr. Aramburu chose to ask him in the 2004

7    exam and he answered.  If they believed that he answered

8    falsely in the 2004 exam, Your Honor, I assume that we

9    would have a count about that.

10                 And what this isn't, Your Honor, I think

11   it's important because I kept going to the intent not to

12   list it, and when I heard Mr. Hirata up here talking, it

13   sounded like he was talking about a conspiracy case or a

14   scheme case or something like that.  That's not what

15   this is.  This is a false statement case.  And so the

16   intent isn't intent to run a grand scheme, it's not

17   intent to, you know, hide.  Certainly, Your Honor, he

18   would be entitled to introduce evidence of who set up

19   SVA.  We're not objecting to that, Your Honor, but what

20   we're saying is evidence that there are these

21   expenditures out of SVA, especially in the context of

22   the disclosures he made.  Because the fact that he made

23   those disclosures in September, and nobody freaked out,

24   Your Honor, the disclosures he made in September are --

25   when you look at the Statement of Financial Affairs and

1    the entities listed, the disclosure in September is the

2    equivalent and more, and there was no -- what that

3    demonstrates -- Your Honor, fundamentally here it

4    demonstrates -- and I keep saying it's a Chapter 11 --

5    this isn't what this -- we're trying a case about a

6    bankruptcy -- a narrative in this bankruptcy that didn't

7    exist.  These creditors knew that the way they were

8    going to get paid is exactly what Mr. Diehl described,

9    he had to go out and do some deals.  And as he told

10   Mr. Tajada taking this exam, he was doing some

11   consulting to keep himself afloat until he could go out

12   and do these deals, and he was going to do the deals

13   through SVA.  That was the bankruptcy.  The bankruptcy,

14   this fictional bankruptcy that Mr. Hirata described

15   where the creditors were pouring over every single one

16   of his bank statements to find out, you know, did he

17   spend too much money on a magazine subscription, because

18   if he did that could have come to us.  That's not this

19   bankruptcy.  It never was this bankruptcy.

20            THE COURT:  Let me ask you a question.

21            MR. WASHBURN:  Sure.

22            THE COURT:  One of the elements is the

23   intent element, as I understand it, it is the intent to

24   defraud.  So explain how you understand it, what that

25   means.

1              MR. WASHBURN:  Your Honor, I'm going to --

2       first I'll start just by reading it out of the footnote

3       number 1 from the government's motion, The defendant

4       made the declaration fraudulently.  Okay.  That's the

5       element that I think when they talk about intent to

6       defraud that they have to establish.  And then when they

7       talk about, To act with fraudulent intent means to act

8       knowingly with the specific intent to deceive,

9       ordinarily for the purpose either to cause financial

10      loss or loss of property or other financial gain, either

11      to oneself or to the detriment of a third party.

12              THE COURT:  So they're talking about the

13      trustee and essentially the creditors.

14              MR. WASHBURN:  That's correct, I assume as

15      far as third party.

16              But, again, the intent, they have to prove

17      that he made that declaration fraudulently.  And the

18      government, when we talk about fraudulent intent,

19      Mr. Hirata up here talked quite extensively about their

20      theory of the subterfuge.  That's not this.  They have

21      to prove -- and it's the only intent they have to prove.

22      So they can't broaden their intent obligation and say,

23      no, no, no, we have to prove this really broad intent,

24      and so let in the kitchen sink.  They have to prove that

25      the defendant made the declaration, that is, the

1 declaration under the Statement of Financial Affairs

2 question 18 where he listed a whole bunch of entities,

3 but not SVA, that he made that omission of SVA

4 fraudulently, that's all they have to prove.  That's the

5 only intent they have to prove.  Their intent -- I'm not

6 saying it's a light burden.  I'll be arguing it's a

7 heavy burden, but it's a narrow burden as to that

8 statement.  It's not as to, you know, when he set up SVA

9 he was intending to defraud.  They don't have to prove

10 that.  When he filed a monthly operating report in

11 October or November of 2012 he intended to defraud,

12 don't have to prove that.  And so we were looking at

13 404(b) and other acts and are those relevant to the

14 intent.  The intent we're talking about is this narrow

15 intent.

16        Your Honor, if I may, Mr. Hirata described

17 something in the 2004 exam that I think is worthwhile,

18 and it's because it's sort of the core of I guess his

19 theory, which is, had they known that he was managing

20 it, they would have asked a bunch of different

21 questions.  And so let me read, and this is on page 79,

22 You know, we're working on several projects right now --

23 and actually let's go back to 78.  Okay.  Okay.  Skyline

24 Venture right now, according to the monthly operating

25 reports, will be making payments to you.

1           That's correct.

2           What are those for?

3           Consulting work.

4           What does that mean?

5           Working on a bunch of projects.  I told you

6  it takes a couple of years.  Just summarizing here.  And

7  we're trying to find consulting work to keep us afloat.

8           When you say consulting, do you mean the

9  same services that you -- listen to the language they're

10  using -- that you were providing through your businesses

11  before you stopped working through Wasatch Pacific?  So

12  they're saying, what is Skyline Ventures doing?

13           He says, Well, we're doing some consulting.

14           And they say, When you say consulting, you

15  mean the same services you were providing through

16  Wasatch Pacific?

17           Yes.

18           Is there -- could there be confusion here

19  about the -- the item Mr. Hirata talks about?  Yes.  I

20  guess when you say providing, I always did this stuff,

21  did it for myself.  I'm actually doing some consulting

22  for people in their own projects, and they're paying me

23  to do it.  Mr. Diehl isn't saying, hey, Skyline Ventures

24  Associates is doing consulting and, you know, I as a

25  consultant with Skyline Ventures am doing it.  No.  I'm

1    doing consulting and they're paying me to do it.

2              Who are you doing that for?

3              And then he describes whom they did it for.

4    And he says it's for the development in Draper.

5              And they pay it to Skyline Ventures?

6              Yes.

7              So what they know is when Mr. Diehl's out

8    there doing consulting in the same work that he did with

9    his other business before he stopped working through

10   Wasatch Pacific, he's doing it through Skyline and they

11   pay Skyline.  They know that.  The thing that Mr. Hirata

12   said was, well, if they had known that he was the one

13   operating it, they would have asked about the payments

14   he was making to himself.  What don't they know?

15             THE COURT:  The question is is whether the

16   jury should hear that.

17             MR. WASHBURN:  Well, Your Honor, whether

18   they should hear this testimony, I agree they should.

19   That's not what we're seeking to exclude.  What we're

20   seeking to exclude is evidence of personal expenditures

21   going out from Skyline Ventures Associates, because I

22   don't think -- I don't think those personal expenditures

23   and the American Express bills and all of that evidence

24   doesn't tell us anything at all, especially, Your Honor,

25   where we're sitting there in November, Skyline Ventures

1    Associates has been disclosed more than it would have

2    been under the SOFA.

3            THE COURT:  Let me frame the issue as I'm

4    understanding it.  I think the government's argument is

5    that Mr. Diehl failed to disclose in the Statement of

6    Financial Affairs the existence of SVA because that

7    advanced his ability to be able to take in money in SVA,

8    use funds for personal expenditures paid out of SVA that

9    otherwise, if they had come to him in his own personal

10   account, would have been disclosed, controlled, argued

11   about in the bankruptcy court, and that is therefore

12   relevant to the question of whether he had an intent to

13   defraud when he failed to disclose SVA.  I think that's

14   the government's argument.

15           MR. WASHBURN:  I think you've articulated it

16   as well.  Although I think they argued it --

17           THE COURT:  The question is is why is it not

18   relevant to what his intent was to show that he was in

19   fact using personal expenditures out of SVA?

20           MR. WASHBURN:  Because, Your Honor, look at

21   Terry Diehl right after the 2004 exam, okay?  And what

22   we have there is there has been way more -- again, let's

23   focus on what's required if he files -- if he listed on

24   the Statement of Financial Affairs.  If he lists SVA on

25   the Statement of Financial Affairs, all he has to do is

1    file periodic monthly operating reports.  Now, certainly

2    the creditors would know he was affiliated with it.  So

3    let's look at what happens the day after the 2004 exam.

4    What do the creditors know?  They know he's affiliated

5    with it because of that 2004 stipulated order.  They

6    know, if they care to, everything in this transcript.

7    They know they have the right to get those bank

8    statements.  I want to be clear, Your Honor, the e-mail

9    showed that Mr. Anderson is offering the bank statements

10   on October 2nd.  I think the evidence is going to show

11   that the response never came back from the creditors

12   right then, and there's some back and forth.  And what

13   finally happens is the Creditors Committee in their

14   billings and in some e-mails there's evidence that they

15   looked at bank statements on -- not until January.  So I

16   just want to be clear there.

17            The point from our perspective is if we're

18   looking at Mr. Diehl's intent to defraud, there he is

19   saying you can have it, come and look at it if you want.

20   Then we ask ourselves, all right --

21            THE COURT:  Here's my question:  Is that an

22   issue for the jury, should the jury hear that evidence,

23   or is that so far afield from the intent issue -- the

24   intent element that the jury shouldn't hear it?

25            MR. WASHBURN:  I think these statements --

1    the personal expenditures are so far afield, and the

2    reason I think they're so far afield is again if we're

3    sitting there in October and Mr. Diehl having disclosed

4    all that, is making personal expenditures, the notion

5    that when he is making a personal expenditure out of SVA

6    in December of 2012, having disclosed everything we know

7    he disclosed, somehow or another that's relevant to show

8    that he intended to defraud clear back in April when he

9    didn't list Skyline Ventures Associates, Your Honor, it

10   proves the opposite.  And I don't want the jury to hear

11   it because I think it's confusing.

12            THE COURT:  Let me pose something that's not

13   grounded in the evidence at all, but it tests the theory

14   of the case and my understanding of it.  Suppose that

15   the evidence were that Mr. Diehl reported on the monthly

16   operating reports consulting income of $10,000.  Suppose

17   that there was $100,000 received by SVA that was spent

18   on the personal expenditures, wouldn't that be relevant

19   to his intent?

20            MR. WASHBURN:  In certain counts it might

21   be, Your Honor.  If this were a concealment case, if it

22   were a scheme case, if it were a failure to disclose

23   $100,000 case, maybe it would.  But in this case, Your

24   Honor, like I said, was he sitting there -- let's put

25   him in November of 2012, and Mr. Diehl is writing a

1    check out of SVA for a personal vacation to Jamaica.

2    I'm making it up, whatever it is.  Now, he knows he's

3    disclosed it all in September, SVA, he listed it as a

4    closely-held entity.  He was asked about it.  His

5    attorneys have said come look at the bank statements

6    whenever you want.  And he makes that personal

7    expenditure.  How is that relevant in any way whatsoever

8    to what his intent was in April of 2012?  If he's making

9    personal expenditures after he's completely disclosed

10   it, how does that show that he hid it so that he could

11   continue making personal expenditures?

12           THE COURT:  Here's the issue:  That may be a

13   very persuasive argument, but is that argument for the

14   jury to hear, or is it one that is so prejudicial that

15   they may confuse the issue and hold Mr. Diehl -- find

16   Mr. Diehl guilty for reasons that have nothing to do

17   with his true intent?  That's the issue.

18           MR. WASHBURN:  I think it's both that

19   prejudicial.  It's also important to note that it's

20   completely uncharged, and its probative value is

21   really -- is quite slight.

22           And so here when we're talking about 404(b)

23   there's a gatekeeper function where under the cases -- I

24   apologize, I don't have it right in front of me.

25           THE COURT:  I understand the cases.

1          MR. WASHBURN:  You've got that list of

2    claims, and one of them is is it charged, is it not.

3    And then you go -- eventually we get to 403.  And I

4    think where we are here, Your Honor, is that intent,

5    that the probative value of these personal expenditures,

6    giving the full context of what went on to his intent

7    back in April of 2012 when he listed all of the entities

8    that he owned, but not this one that he didn't on the

9    SOFA is so small that when we have a trial, and they

10   start to put on evidence that's going to look like a

11   bankruptcy scheme to defraud case, which this isn't,

12   it's going to be so prejudicial that the jury's going to

13   get confused, and there's a substantial risk.

14          THE COURT:  Let me ask this question:  Would

15   it make a difference in your argument if the personal

16   expenditures occurred before the Statement of Financial

17   Affairs as opposed to after the Statement of Financial

18   Affairs?  Because the question of intent is the intent

19   at the time he submitted the Statement of Financial

20   Affairs.  And to the extent we consider subsequent

21   evidence, it has to be evidence that is sufficient to

22   show that at the time he entered it -- I compare it kind

23   of like to a contract case.  You have a contract case

24   and you try to prove what the intent of the parties was

25   when they entered the contract, you can look at the

1    course of dealings to say, you say now that your intent

2    was X but for three years you acted as if it were Y,

3    that evidence is admissible.  So we have two segments

4    here.  One is the period of time before the Statement of

5    Financial Affairs and whether there were personal

6    expenditures used by Mr. Diehl out of SVA before he

7    signed it.  The second one is subsequent events.

8                    MR. WASHBURN:  And I understand the

9    distinction, Your Honor, because you're saying, look,

10   those ones before, it seems, would give much more of a

11   buildup to, okay, well, what's he thinking --

12                   THE COURT:  Yes.

13                   MR. WASHBURN:  -- you know, on that date

14   when he signed it.  And I guess what I would say, Your

15   Honor, is our motion, as I've thought about it, has

16   primarily been focused -- it was something that we

17   thought up when we were looking at all these exhibits.

18   The summaries, that all of theirs are, you know,

19   post-filing expenditures.  I think those personal

20   expenditures, if you're asking --

21                   THE COURT:  There is at least, I believe,

22   maybe this is another motion, but I believe there's

23   evidence of personal expenditures before he signed the

24   statement.

25                   MR. WASHBURN:  There's certainly one of

1   their summaries, I think, that talks about that, Your

2   Honor, now that you mention it.  I guess for present

3   purposes, Your Honor, I've been thinking --

4           THE COURT:  It may also go to the question

5   of whether he's a managing executive.

6           MR. WASHBURN:  The pre-expenses?  You know,

7   Your Honor, I think that's fair to say, well, might that

8   demonstrate whether he's a managing executive.

9   Honestly, Your Honor, I feel like I would like to think

10  about that one a little bit because that distinction

11  isn't one that I've considered.

12          THE COURT:  The one that immediately comes

13  to mind is the purchase of the Mini Cooper.

14          MR. WASHBURN:  Maybe that's a good segue for

15  me to sit down and for Mr. Peters to talk.

16          THE COURT:  Let's hear from Mr. Peters.

17  Mr. Peters, you can determine what's most comfortable,

18  whether you just remain there or whether you move up to

19  the podium.  And it's supposed to slide down far enough

20  for you.

21          MR. PETERS:  I might do a little bit of

22  both, Your Honor.  I like to get the some exercise.

23          May it please the court, Your Honor, my

24  argument -- comments this morning are directed to

25  document 86, rather than to the more comprehensive

1  motion that Mr. Washburn has argued.  And I want to lay

2  into the record that this motion was prompted by a

3  witness disclosure on October 21st, 2017.  Our motion is

4  specifically directed to currently marked Exhibits 12-7,

5  12-8, 12-9, 12-10, 12-11, 12-12, and 12-13.  I would

6  note preliminarily that the government has pointed out

7  that we do not in our motion ask to exclude Exhibit

8  12-14.  And they're right.  That's in a different

9  category of exhibits, Your Honor, because Exhibit 12-14

10 is postpetition.  To the extent that dates are useful

11 here and responding to the court's inquiry about

12 prepetition conduct, if you will, versus postpetition

13 conduct, it is significant that the vehicle that the

14 court referred to was purchased on or about

15 December 5th, as near as I can tell.  I may be off by a

16 few days, but I'm close I think.

17            THE COURT:  As I remember, there were

18 actually two vehicles, there was a Fiat that was

19 purchased on, as I remember, about December 1st, it was

20 traded in in exchange for a Mini Cooper on about

21 December 5th.

22            MR. PETERS:  Sounds right to me, Your Honor.

23            THE COURT:  I suspect that all of those

24 transactions will be offered by the government.

25            MR. CASTLE:  That's correct, Your Honor.

1            MR. PETERS:  Yes.  I'm just noting for the

2    record that the exhibit the government refers to, number

3    12-14, refers to conduct on or about May 1st, 2012, so

4    it's postpetition and is not currently the subject of my

5    argument to the court.

6            So I saw that in the court's order on the

7    prior motion in limine the court cited to the *Henthorn*

8    case.  Probably a useful case to discuss very briefly

9    because it's such a different form of prosecution.  Not

10   only is it a homicide case, but the similars involved,

11   allegations of the defendant murdering his late wife, I

12   guess I should say for the record.  And so it's all a

13   rifle-shot analysis.  It doesn't lay out like this case

14   does as a canvas where there is conduct that today the

15   government is essentially arguing as scheme conduct, but

16   they've charged, as we know, specific acts of fraud.  So

17   if we just assume for a moment that this evidence is

18   being offered for a proper purpose under *Henthorn*, I

19   mean I'll just assume that for a moment, but it's hard

20   to reconcile it to the government's prior position here

21   in which, as the court noted in its October 19th order

22   at document 74, the government conceded earlier in this

23   prosecution that it only intends to proffer evidence for

24   three items that were provided in an addendum under

25   seal, item 3, 6, and 9.  It's our argument today that

1    the evidence directed to these vehicles would violate

2    the government's agreement, I'm going to call it, or the

3    government's concession in the court's prior order

4    because it would trample on items 4 and 14 in the

5    addendum.  But I'm not sure that that's dispositive of

6    the problem here.  Additionally, the evidence must be

7    relevant under *Henthorn* and ultimately *Huddleston*.

8              So what do we know from what appears to be

9    undisputed evidence on the vehicle transaction?  We know

10   that some form of cash was paid to purchase the vehicle,

11   in addition to the value of the trade on the earlier

12   vehicle.  We know that it was tiled to SVA.  I would

13   represent to the court that the funds cannot be traced

14   and will not be traced to any SVA account.  Mr. Hirata

15   mentioned that an SVA account was opened.  That's true.

16   I believe it was opened in late 2011.  But there is no

17   evidence that that account which was opened with a check

18   written by Kim Monroe, who the court has heard about, in

19   the amount of $1,000, there is no evidence that that was

20   the source of payment for this vehicle.

21             So, ultimately, we know that about four

22   months before the petition was filed on March 30, 2012,

23   Mr. Diehl apparently facilitated the purchase of a

24   vehicle that was titled to SVA, all of this in relation,

25   I might add, to his individual bankruptcy.  I mean I

1   think distinctions make a difference sometimes.  And as

2   the court is aware, bankruptcy is a legal fiction.  This

3   was an individual Chapter 11 reorganization, and SVA was

4   not the debtor.  And it is not alleged, as the court has

5   pointed out, that SVA was the alterego of the debtor in

6   bankruptcy.  It isn't even alleged in the Indictment

7   that SVA was an affiliate of the debtor.  So --

8                THE COURT:  It seems to me -- I don't want

9   to cut off your argument, but it seems to me that if

10  this evidence is relevant at all, it is relevant to the

11  question as to whether or not Mr. Diehl was the managing

12  executive of SVA.

13               MR. PETERS:  That's exactly right, Your

14  Honor.  That's what it comes down to.

15               THE COURT:  So address if he was executing

16  these transactions on behalf of SVA, is that

17  probative -- is that some evidence that would advance

18  the proposition that he was the managing executive?

19               MR. PETERS:  And I would say that on a

20  prepetition analysis it is not.  This case, this

21  bankruptcy case that we're here about was commenced on

22  March 30th, four months after these vehicles were

23  acquired.  They don't tie to anything about the business

24  of SVA.  There are few evidentiary arguments I would

25  like to turn to in a moment that I think make it dubious

1    whether the evidence can possibly suggest by -- at least

2    by a preponderance of the evidence in admitting it or

3    not.  I'm not sure that a preponderance of the evidence

4    suggests that it would be admissible as evidence that

5    the court is alluding to as evidence that Mr. Diehl was

6    a managing executive of SVA.

7              But what I can tell the court as well is

8    that there won't be many examples of this postpetition.

9    In other words, it is not the case, categorically not

10   the case, that Mr. Diehl continued to buy vehicles and

11   title them to SVA after the date of the petition.  I

12   don't expect the evidence will show so.  And it is not

13   the case further -- let's just turn to what I think the

14   court is alluding to, if I may.  May I hand up two

15   exhibits?  I think that's all I'm going to need.

16             THE COURT:  Sure.

17             MR. PETERS:  May I have a moment, Your

18   Honor?

19             THE COURT:  You may.

20             (Mr. Peters handing exhibits to Mr. Hirata.)

21             MR. PETERS:  Your Honor, what's before the

22   court are two exhibits previously marked by the

23   government.  It consists of Government's Exhibit 12-8 in

24   what I'll call its unabridged form for the moment

25   because there are several versions of Government's

1    Exhibit 12-8 now based on the government's latest
2    filings.  And then the other exhibit I've handed up is
3    Proposed Exhibit Government 12-10.  So that's 12-8 and
4    12-10.
5              Now, beginning with 12-8, it's my
6    understanding that this purports to be ultimately a
7    36-page compilation of some form of mailing containing
8    the contents of the Mini Cooper transaction.  It appears
9    to be a mailing to Mr. Diehl.  But if you back into the
10   exhibit, Your Honor, I think by seven pages you'll see
11   what is entitled a Resolution of Board of Directors of
12   Skyline Ventures Associates, Inc., but it's not signed,
13   the difference being it's not signed.  So it appears --
14   and we've attempted to contact the witnesses who were
15   disclosed on Saturday and I think again one of them on
16   Monday, and thus far unsuccessful.  But it appears that
17   the dealership prepared the resolution that, at least in
18   Exhibit 12-8, is unsigned.  And understanding what it
19   represents, those representations include a
20   representation that the corporate seal of the
21   corporation would be hereinto affixed.  And you'll note
22   that in Exhibit 12-10 there is no such seal.  There's a
23   signature, but there's no seal.
24             I would also ask the court to note that --
25   where is this exactly?  Yes.  And that the above is a

1    true and correct copy of a resolution duly adopted at a

2    meeting of the board of directors thereof convened and

3    held in accordance with the law and bylaws of the said

4    corporation.  In other words, that the corporation and

5    its board of directors had made a decision to purchase

6    this vehicle, and there is no such resolution in the

7    government's evidence.

8            And further, as we have tendered in our

9    final proposed jury instruction number 7, under Utah law

10   all corporate power shall be exercised by or under the

11   authority of, and the business and affairs of the

12   corporation managed under the direction of, its board of

13   directors.  I believe I'm referring to Utah Code

14   Annotated 16-10a-801.  I make these points because it is

15   unclear that the document marked as Exhibit 12-10 could

16   be sufficiently authenticated under Rule 9014, or under

17   any category of the non-hearsay exception 801 should it

18   be authenticated.

19           So this is a long way of saying, Your Honor,

20   on the point that you raise as to the managing

21   executive, I'm not sure the court could find by a

22   preponderance of the evidence that Exhibit 12-10 in a

23   signed version should come before the jury as admissible

24   evidence.  And I make that point independently.

25           THE COURT:  Why wouldn't it come before the

1    jury as an admission of the defendant?

2              MR. PETERS:  Well, only if it can be

3    established that it's authentic.

4              THE COURT:  Meaning his signature.

5              MR. PETERS:  Yes.  And I will also add, Your

6    Honor, that --

7              THE COURT:  Obviously that has to be

8    established.

9              MR. PETERS:  Right.  And if so, I

10   anticipate, the government hasn't said so, they would

11   offer this through the testimony of Kim Monroe, the

12   assistant that Mr. Washburn referred to.  We believe

13   that this document was taken by Ms. Monroe in some form,

14   whether it was executed or not, when her employment

15   ended, which was well before the Indictment in this

16   case.  And I would also note that Mr. Diehl had a stamp

17   that she routinely used to sign his signature.  So there

18   are a number of questions about the document

19   independently of the *Henthorn* analysis.

20             The government filed a response to our

21   motion last night at approximately 5:00 p.m.  I have a

22   few hopefully helpful comments about that in lieu of a

23   reply.  At page 4 of the response the government

24   indicates that Mr. Dooley, who was apparently the car

25   salesman, required the defendant to provide a corporate

1   resolution from SVA showing that he had the authority to

2   act on SVA's behalf before the car could be titled.

3          Your Honor, we're not sure, again, that

4   anybody on our side prepared this resolution.  We think

5   it may have been prepared by the car dealer, and that

6   the car dealer required this to go forward with the

7   transaction.  So at the time of this hearing this

8   morning we object to the introduction of the evidence,

9   even if you find it would satisfy Rule 404(b), as

10  evidence of intent.  I can tell you that you won't see

11  these resolutions in the evidence that I've been

12  provided at any date after December 5, 2011, they

13  won't -- they are not something that you'll see

14  postpetition, you won't see them in any other fashion

15  prepetition.

16         And so I think that focuses us on the 403

17  analysis because that's one of the tests we have to go

18  through under *Henthorn*.  And I don't want to belabor the

19  point, but I think the evidence that is before the court

20  and the exhibits that we have identified for exclusion

21  clearly raise 403 concerns that outweigh the probative

22  value of this isolated resolution if it can be

23  authenticated and properly admitted at trial.  The

24  content of it clearly does not bear on this bankruptcy.

25  I would say I believe that the vehicle was sold sometime

1   postpetition and the proceeds were deposited into an SVA

2   account.  But there's not going to be any evidence in

3   this case that SVA was in the business of buying or

4   selling vehicles.  SVA was in the business of developing

5   land and related ancillary services.

6          So I believe, Your Honor, that this is being

7   proffered before the jury to prejudice the defendant.  I

8   believe it would prejudice the defendant significantly

9   and that the prejudice would be substantial and would be

10  far greater than any probative value and would warrant

11  exclusion under 403.  It's a side show to this

12  bankruptcy case, this particular transaction is a side

13  show.  It doesn't come from any evidence I've reviewed

14  from advice of counsel provided to Mr. Diehl, it doesn't

15  come from any elaborate planning that I can deduce to

16  engage in a scheme.

17         And as Mr. Washburn has pointed out quite

18  correctly, there is no scheme charged here.  If this

19  were a scheme case that were alleged to have begun in

20  December of 2011 with this event, for example, it might

21  be different.  But it's a rifle-shot Indictment now with

22  all of these counts having been abandoned.  There's just

23  the one bankruptcy fraud count.  It comes much later on

24  April 12th of 2012.  It is not, in my view, proximate in

25  time to the transaction that I'm discussing, we'll call

1     it the vehicle transaction.

2                The government cites several cases, all

3     Tenth Circuit, at page 8 of their response yesterday

4     afternoon for the proposition, among others, and you

5     heard this from Mr. Washburn, that somehow this vehicle

6     purchase is inextricably intertwined with what is

7     charged.  So let's figure out what would really have to

8     happen for that to be an accurate statement.  First of

9     all, and this is a distinction with a difference that

10    will pervade I believe the entire legal analysis of this

11    Indictment, as Mr. Washburn has pointed out, this is a

12    reorganization in bankruptcy.  This was not a bankruptcy

13    filed to discharge debt, to liquidate debt.  And so the

14    purchase of this vehicle might be far more relevant if

15    it was an asset that could have been used to pay

16    creditors in liquidation, which it was not.  So I don't

17    countenance the idea that the government is advocating

18    that somehow the purchase of this vehicle four months

19    before bankruptcy was, quote, inextricably intertwined

20    to the false statement that is alleged on the Statement

21    of Financial Affairs.  I likewise don't countenance that

22    this evidence, as the government puts it, is part and

23    parcel of that proof because it's not proximate in time

24    and it's obviously not the motivation for the

25    bankruptcy.  Mr. Diehl did not seek bankruptcy

1    protection to hide this transaction, to hide this asset,

2    to conceal this asset from his creditors.

3              The bankruptcy involved, as I understand it,

4    about $37 million dollars of debt.  It's not what the

5    case was about.  Mr. Diehl went into bankruptcy

6    individually to reorganize.  And as the court has heard

7    in prior proceedings, has repaid a substantial portion

8    of the debt.

9              So it rings out to me, Judge, that this

10   evidence would be substantially outweighed by the danger

11   of unfair prejudice and the court should very carefully

12   consider whether it should come before the jury.

13             Now, I don't -- I would like to hear what

14   the government will say, but at page 9 of 14, the

15   government says that the evidence in question here, the

16   vehicle transaction, proves the defendant's plan,

17   preparation, knowledge, and intent to falsely omit SVA

18   from the Statement of Financial Affairs.

19             Not to be repetitive, I would ask how.  To

20   me it proves the defendant's intent to seek an

21   arrangement with someone for whom he bought a car that

22   was titled to this business and doesn't tie in any

23   significant way to his intentions in bankruptcy.

24             As I've noted, there are no other examples

25   of Mr. Diehl representing himself to be an officer or

1   director of this entity in any of the evidence.  There

2   were 600 exhibits.  This is only one.

3            At page 11 of the response the government

4   argues that this evidence goes to prove the defendant's

5   motive, knowledge, and intent about lying and concealing

6   SVA from his creditors.  And on December 5, 2011, I

7   would ask the court what creditors could they possibly

8   be referring to since there was no bankruptcy estate,

9   there was no bankruptcy petition, and none of the legal

10  fiction that attends all of that was in place.  So there

11  is no evidence that this vehicle was titled to SVA to

12  keep it out of the reach of someone that Mr. Diehl owed

13  money.

14           The proposed evidence the government

15  contends is relevant under Rule 402 because is highly

16  probative of the defendant's state of mind, I would say

17  that the evidence before the court is highly probative

18  of the defendant's intent to purchase this vehicle

19  trading a Fiat for it and putting down cash.  They can't

20  be traced to this estate.  The government's not trying

21  to trace it to this estate.  And, again, we have a

22  fundamentally different form of bankruptcy at play here,

23  namely a reorganization.

24           Your Honor, I understand that the court has

25  substantial discretion in ruling on this motion.  These

1    are my comments.  I feel very strongly that this will

2    prejudice our case, this particular piece of evidence

3    that I'm focusing on.  And to get a fair trial we ask

4    that it be excluded.

5              Yeah.  I guess my final comment about the

6    response would be that the government cites to the *Old*

7    *Chief* case.  These felon in possession cases keep coming

8    up all the time in 404(b) analysis, and it's inevitable

9    because there's a proof requirement on the underlying

10   conviction.  But to be unfair, according to the United

11   States Supreme Court, the evidence has to have the

12   capacity to lure the factfinder into convicting on a

13   ground different from proof specific to the offense

14   charged.  And that's what I think we have here.  We have

15   a fairly nefarious piece of evidence.  It doesn't tie

16   well to this bankruptcy.  It is only an isolated

17   instance of unique form of resolution, like the ones

18   before the court in this argument as Exhibits 12-8 and

19   12-10.  And I ask the court to exclude the evidence.

20             I would like to reserve time for reply, if

21   the court will hear it, although I know that the hearing

22   has been going for some time.  Thank you, Your Honor.

23             THE COURT:  Thank you.

24             Mr. Castle, I hate to do this, but I have an

25   obligation before the judge's meeting on an item that I

1   am primarily responsible for, so I'm going to -- we're

2   going to have to take a break.  I know you're all really

3   busy getting ready for trial, but if we came back at

4   1:30, would that inconvenience everybody too much?

5             MR. CASTLE:  Your Honor, that will work for

6   the United States.

7             MR. PETERS:  Fine for us.

8             THE COURT:  I'll hear your argument at 1:30,

9   and hopefully by that point, after further argument, be

10  in a position to rule on the motions.  We will be in

11  recess until 1:30.

12            (Recess.)

13            THE COURT:  We are back in session in United

14  States v. Diehl.  Counsel are present, Mr. Diehl is

15  present.

16            Mr. Castle.

17            MR. CASTLE:  Thank you, Your Honor.

18            Your Honor, I thought maybe before I get

19  into the substance of my argument that we would go over

20  the exhibits.  As I indicated in my response as to

21  Exhibit 12-8, I reviewed that exhibit yesterday and

22  realized there are probably documents in there that

23  under no circumstances would we admit those, and so what

24  I did is I went ahead and attempted to re-mark the

25  exhibits that I believe we will use.  There's still

 1    12-8.  And, Your Honor, I should have mentioned with

 2    respect to 12-8 the exhibit that was given to the court

 3    actually was missing a cover page on that document.  And

 4    I have that for the court, if I could approach.  Not

 5    that this is necessarily a huge issue, it's not, I just

 6    want to let the court know that that was -- that

 7    Exhibit 12-8 was an exhibit that was obtained when a

 8    search warrant was executed on Mr. Diehl's home, and

 9    apparently this is a file that was being maintained by

10    Kim Iba.  And you can see on the front there it says

11    Liz.  As I understand it, Your Honor, that refers to Liz

12    Carillo, the woman for whom Mr. Diehl purchased the Fiat

13    and then the Mini Cooper.  So I just wanted to clarify

14    that.

15              I think that at least -- I think it's

16    generally our office's practice, Your Honor, is that we

17    overidentify exhibits and mark them for the reason that

18    it's hard to anticipate what's going to happen at trial,

19    and we might need to use an exhibit that we didn't think

20    we were going to use.  We certainly don't want to be

21    accused of not identifying that particular exhibit as an

22    exhibit.

23              I've also handed, Your Honor, to Mr. Peters

24    what I will call a reconstituted Exhibit 12B which

25    involves 12A -- excuse me, 12-8, 12-8B, 12-8C, and

1   12-8D.  And I have those for the court.  I know I sent

2   copies over.  I just wanted, in the event they are not

3   handy, there they are.

4           Your Honor, originally the motion of

5   Mr. Peters, at least the way I read it, was a motion to

6   enforce the court's prior in limine order.  And as we've

7   proceeded here, and I think as I articulated in my

8   response, that the evidence that we propose to use

9   that's identified in these exhibits that we've been

10  talking about don't violate your previous in lim order.

11  I mean that was the caption at least on this motion.

12  It's our position that it doesn't.  We're talking about

13  a different kind of evidence.  In fact, my response

14  would be, based on your ruling, that we had to show

15  personal expenses, that we in fact are following that

16  order, and calling these witnesses, Ms. Carillo in

17  particular, to talk about personal expenses that

18  Mr. Diehl expended on her benefit and coupled with that

19  and we're going to bring in other evidence to show that

20  that money was taken from Skyline Ventures Associates'

21  account postpetition, or after the filing.

22          THE COURT:  Let me follow up on that because

23  Mr. Peters represented that they were unable to trace

24  the funds to an SVA account.  Do you have evidence to

25  the contrary?

1        MR. CASTLE:  Well, let me tell you -- I'm

2   glad that came up, Your Honor, because I've thought

3   about that.  So this is what we do have:  The Fiat was

4   purchased in the name of SVA, an SVA asset.  Mr. Diehl

5   took an SVA asset and he traded it in.

6        THE COURT:  Do we know where the money came

7   from to buy the Fiat?

8        MR. CASTLE:  Your Honor, we believe, though

9   not a hundred percent sure, that the money came from

10  Mr. Diehl's withdrawal of $95,000 from a casino account.

11  And let me just say this:  Your Honor, when the Fiat was

12  purchased it was purchased with cash, $40,000, $100

13  bills.  And when the Mini Cooper was purchased, as I've

14  indicated in my response, 17,000 plus dollars in cash

15  was paid, once again in $100 bills.  So it's our

16  position, Your Honor, when it comes to that issue that

17  Mr. Diehl -- regardless of where the cash came from, the

18  Fiat was titled in the name of -- or purchased in the

19  name of SVA.  It became an SVA asset at that point.

20  Then when he took that Fiat, which was as good as money,

21  money that belonged to SVA, and purchased the Mini

22  Cooper, that demonstrates his control over assets of

23  SVA.  You can call it money.  It had a numerical value.

24  And the Mini Cooper dealership gave Mr. Diehl what it

25  thought was the appropriate value on the trade-in.  So

1    that's our position when it comes to the use of SVA

2    assets for personal use.

3            Your Honor, but the evidence also

4    demonstrates what has been kind of the center of today's

5    hearing, and that is, evidence to show that Mr. Diehl

6    knowingly and fraudulently failed to disclose SVA in

7    response to question 18.  Well, Your Honor, I went back

8    to my office -- we've been talking a lot about question

9    18 but we haven't spent the time just to read what it

10   asks, but it's important.  Your Honor, I have that

11   exhibit here, Exhibit 2-5.  I provided that to defense

12   counsel, and I've tabbed it, Your Honor, just for

13   convenience purposes only.  Because what's interesting

14   about question 18, Your Honor, it asks, if you go to 18

15   subparagraph a., it says, If the debtor is an

16   individual, list the names, addresses, taxpayer

17   identification numbers, nature of the businesses, and

18   the beginning and ending dates of all businesses in

19   which the debtor was an officer, director, partner, or

20   managing executive of a corporation, partner in a

21   partnership, sole partnership, or self-employed in a

22   trade, profession, or other activity either full or part

23   time within six years immediately preceding the

24   commencement of this case.  So what that question

25   requires, Your Honor, is for a debtor to disclose the

1  fact that he or she has been, among other things, a

2  managing executive of a corporation six years prior to

3  the filing of bankruptcy.  So with Mr. Diehl, Your

4  Honor, the evidence that we're talking about is well

5  within that six-year period.  It is within about four,

6  four and-a-half months.

7         But, Your Honor, it's the government's

8  position that the fraud that Mr. Diehl engaged in, when

9  it came to the filing of the Statement of Financial

10 Affairs, started long before he filed bankruptcy.  It

11 started, Your Honor, when he formed SVA on

12 November 22nd, and that followed the formation of SVG,

13 Skyline Venture Group, in October of 2011.  And what's

14 interesting about those two, Your Honor, is that

15 Mr. Diehl owned 33 percent of SVG.  Each one of his

16 daughters owned 33 percent.  Based on that ownership,

17 Your Honor, that's clearly an entity that would have to

18 be disclosed in response to question 18.

19        So what Mr. Diehl did, Your Honor, is he

20 formed another company where on paper he's not an owner,

21 on paper he's not an officer.  But in reality, Your

22 Honor, he was nothing less than the managing executive

23 of SVA.  And how do we know that, Your Honor?  Because

24 within, what, 13 days of forming SVA Mr. Diehl is out

25 buying a Mini Cooper.

1          Your Honor, we have interviewed Mr. John
2     Dooley, and I will talk to him again most certainly, but
3     I will represent to the court that he asked Mr. Diehl
4     for a corporate resolution.  The dealership did not put
5     that together.  That was Mr. Diehl.
6          And, Your Honor, just to draw this one
7     important point, when you look at Exhibit 12-8, and
8     Mr. Peters talked about this, there's a corporate
9     resolution that's in there that's not signed.  But keep
10    in mind that corporate resolution was found at
11    Mr. Diehl's home when the search warrant was executed.
12    The document we want to use is the document that is
13    signed that Desert Mini Cooper of Las Vegas, if I've got
14    that right, that's the one that they received.
15         Your Honor, we understand there might be
16    some authenticity issues arising, and certainly we know
17    well enough that we're going to have to satisfy those
18    before the document is admitted, which we plan on doing.
19    But, Your Honor, that document's critical because it
20    shows the knowledge of Mr. Diehl and the way he viewed
21    his relationship with Skyline Ventures Associates.  And
22    despite that, when it came to filing his Statement of
23    Financial Affairs he didn't disclose SVA.  And there's
24    another interesting point about that, Your Honor, if you
25    look at question 18 you will see that Mr. Diehl

1    disclosed I think 15 different entities, and the only

2    entity he didn't disclose, the only entity that made any

3    difference is the one he didn't disclose.  And, Your

4    Honor, the transaction involving the Fiat and the Mini

5    Cooper are relevant to showing Mr. Diehl's intent to

6    falsify his answer to question 18 on his Statement of

7    Financial Affairs.

8              And let me just make a note here, Your

9    Honor, I think there's some notion out there in the

10   legal world that if a particular allegation is not

11   contained in the Indictment, that that somehow

12   supersedes the concepts of intrinsic evidence and 404(b)

13   evidence.  I think that's an over-reading of what is

14   required for the United States to put in the Indictment

15   that's returned by a grand jury.

16             Your Honor, I make this point, and I know

17   that defense counsel talked about this, they talked

18   about, well, the government's using the word concealment

19   in the context of this false declaration.  Well, my

20   question would be what else do you call it when you fail

21   to disclose SVA?  What's your purpose for not disclosing

22   it?  You can call it concealment, you can call it

23   hiding.  And when they talk about concealment as a

24   charge, Your Honor, I want to point out that

25   concealment -- well, 152(1) concealment crime requires

1   an extra element of proof that is not required by a

2   false declaration count.  And that is, Your Honor, we

3   have to show that the property concealed was property of

4   the estate.  We're not saying that SVA was property of

5   Mr. Diehl's estate, just like we're not saying that all

6   the other companies he listed were property of the

7   estate.  What's property of the estate is his interest,

8   Your Honor, in those companies, and it's important to

9   list those because creditors want to know if there are

10  assets available in these companies to pay them back.

11          Mr. Peters wanted to make the distinction,

12  Your Honor, between, well, this is a Chapter 11 and

13  somehow it's different.  Let me make two comments about

14  this.  The Statement of Financial Affairs here, 2-5,

15  Your Honor, this is a document that is used in every

16  Chapter 7, every Chapter 13, every Chapter 11 case.

17  There's not some different standard with a Chapter 11

18  case.  In a Chapter 11 case, Your Honor, the debtor's

19  objective is the same as in a 7, and that is to get a

20  discharge of his or her debts.  If you were to look at

21  the plan of reorganization that Mr. Diehl confirmed in

22  this case, you would see that very language, Your Honor,

23  that upon confirmation and the effective date of that

24  plan he received a discharge of his debts.  So people

25  that file bankruptcy, that's the objective.

1              Just as a footnote, Your Honor, I might

2     mention that when it comes to Chapter 11 cases there was

3     a period of time in my career that I was a bankruptcy

4     attorney, I worked at the U.S. Trustee's Office myself,

5     that there's about a 1 percent chance for Chapter

6     11 cases to be confirmed, and 99 percent of the time

7     they ended up either dismissed or converted into a

8     Chapter 7.  I'm not saying that's a real important

9     issue.  I'm just trying to make the point that, Your

10    Honor, the requirement of being honest with respect to

11    question 18 it doesn't matter what bankruptcy you file.

12             So, Your Honor, the exhibits that have been

13    identified up to Exhibit 12-14, Your Honor, deals with

14    the transaction involving the Fiat and the Mini Cooper.

15    Yes, we will have witnesses testify and authenticate

16    those documents.  Your Honor, that evidence is relevant

17    from our perspective.  It's intrinsic, Your Honor, to

18    show the requisite intent that Mr. Diehl had when he

19    failed to disclose SVA on his Statement of Financial

20    Affairs at the time he filed these.  And, Your Honor, I

21    appreciated your comment about that, that what we're

22    focusing in on is what was Mr. Diehl's intent at the

23    time he filed his Statement of Financial Affairs, not

24    two years later, not the time the plan was confirmed.

25    That's really not relevant.  What's relevant is what was

1   your intent at the time.  And the way for us to see that

2   is his behavior before and his behavior after.

3           And I find it interesting, Your Honor, that

4   Mr. Peters did not want to talk about Exhibit 12-14.

5   And you have that, Your Honor, I provided that to you

6   because 12-14 is the bookend to the corporate resolution

7   Exhibit 12-10.  Because what's happened, apparently,

8   Ms. Carillo needed some keys, she needed those around

9   May 15th of 2012.  And, Your Honor, that date's

10  important, May 15, 2012.  Mr. Diehl's 341 meeting was

11  May 8th of 2012.  And there on May 15th, according to

12  this attachment to an e-mail that went to a Daniel

13  Reeves, Mr. Diehl, appears to be a copy of a business

14  card.  It says, Skyline Ventures Associates, Inc., Terry

15  C. Diehl, CEO-Consultant.  So we have Mr. Diehl, he

16  called himself whatever he wants, Your Honor.  At some

17  point in the 1st of December he's identifying himself as

18  the president of Skyline Venture Associates.  He has the

19  authority to buy the Mini Cooper.  And then when he's

20  asking for these new keys for Ms. Carillo he identifies

21  himself as the CEO.  Well, he can do that, Your Honor,

22  because he's the managing executive of Skyline Ventures

23  Associates, and he does this right after his 341

24  meeting.  And at that 341 meeting he testified under

25  oath that the statements and schedules were true and

1    correct, Your Honor.  Seven days later he's out

2    representing to the public that he, no, is the CEO.

3              And not to reiterate what Mr. Hirata said,

4    Your Honor, but Mr. Diehl never properly disclosed his

5    relationship to SVA.  And what's interesting about

6    bankruptcy, Your Honor, if you make a mistake on your

7    Statement of Financial Affairs or your Schedules of

8    Assets and Liabilities you could always go back and

9    amend those.  Did Mr. Diehl do that?  No, he didn't,

10   neither did his attorney.  And I'll be curious to hear

11   from Jimmy Anderson when he takes the stand, Your Honor,

12   to talk about the stipulation and order related to the

13   2004 where it indicates -- or that Mr. Diehl was

14   stipulating that that's a closely-held entity that he

15   has an interest in or has a business relationship in.

16   My question for Mr. Anderson is going to be, well, with

17   that knowledge, Mr. Anderson, why didn't you go back and

18   amend these Statement of Financial Affairs?  That's a

19   critical question because debtor's counsel has an

20   ongoing duty to make sure the documents filed with the

21   bankruptcy court are true and accurate.

22             So, Your Honor, based on the evidence

23   confined to the 12-8 exhibits I've talked about, 12-9,

24   12-10, 11, 12, 13, 14, Your Honor, it's our position

25   that this evidence is relevant, it goes to the issue of

1  Mr. Diehl's intent, whether we call it intrinsic or

2  404(b).  If we call it 404(b), it certainly fits in the

3  category of plan, knowledge, and motive.  And based on

4  that, Your Honor, we would ask that you deny the motion

5  that's been filed to enforce your in limine order.

6           THE COURT:  Thank you.

7           Mr. Peters, do you wish to respond?

8           MR. PETERS:  Very briefly.  Without

9  restating any argument and having attempted to

10 countenance the court's questions, as well as

11 Mr. Castle's argument, it's our position that the court

12 should enter an order in limine excluding the following

13 marked Government Exhibits 12-6, which was not a subject

14 of the motion, 12-7, 12-9, 12-11, 12-12, and 12-13.  We

15 stand by the proposition that as to Exhibits 12-10

16 and -- yes, 12-10, Your Honor, that you inquired about

17 in my argument, that 403 considerations warrant

18 excluding that exhibit for the reasons stated on the

19 record today.  However, if the court is inclined to

20 permit the use of that exhibit, then we would ask that

21 outside of the hearing of the jury we be allowed to

22 inquire of the witness John Dooley as to the

23 authenticity of that exhibit, which we believe would

24 avoid further prejudice to Mr. Diehl in the event that

25 you do permit any of this evidence at trial.  Thank you,

1    Your Honor.

2              THE COURT:  Thank you.

3              Let me see if I can match your list with the

4    list that Mr. Castle has just given me.  I don't know

5    that I have 12-6.

6              MR. PETERS:  12-6 was not tendered by any

7    party in this motion practice, Your Honor.  For the

8    record, I'm told that it purports to be a September 14,

9    2011, e-mail from Mr. Diehl to the same witness who's

10   under discussion in this motion.

11             THE COURT:  Let me ask --

12             MR. CASTLE:  Your Honor, we don't -- there's

13   a little more to Exhibit 12-6 that would explain why

14   defense doesn't want that admitted.  We don't plan on

15   offering that exhibit.  And I indicated that, Your

16   Honor, in my response.

17             THE COURT:  I will -- with respect to 12-6,

18   it will be -- assuming the government is not intending

19   to offer it, the court grants the motion.

20             What about 12-7?

21             MR. CASTLE:  What was 12-7?  Was 12-7

22   included, Your Honor, in --

23             THE COURT:  What I have --

24             MR. CASTLE:  Your Honor, I'm sorry, but that

25   was not an exhibit listed, so I don't have that in front

1    of me to be able to comment.  I focused on 12-8, 9, 10,

2    11, 12 and 13, and then my 14.

3              THE COURT:  That's all I have in front of

4    me.

5              MR. CASTLE:  Yes.  So I would ask that you

6    not make a ruling as to 12-7 being that I can't remember

7    what it is, so ...

8              THE CLERK:  E-mail from -- (not able to hear

9    the clerk.)

10             MR. CASTLE:  Oh, okay.  Then that would

11   include 12-7, Your Honor.  That's fine.

12             THE COURT:  That would be granted as to

13   12-7.

14             What's 12-9, Mr. Peters?

15             MR. PETERS:  It purports per the exhibit

16   list provided by the government to be a Nevada DMV

17   record for a 2012 Mini Cooper.

18             MR. CASTLE:  Well, Your Honor, that's

19   important because it demonstrates a couple of things.

20   First of all, the car was purchased for Ms. Carillo's

21   personal use.  It was titled in Nevada, she drove the

22   car in Nevada.  It was actually never used for business

23   purposes.  It was used for her personal use, so that's

24   important for us to prove where that car was titled,

25   where it stayed, and who drove that car, with

1    Mr. Diehl's permission, I might add.

2              THE COURT:  All of these rulings are subject

3    to authentication and foundation, but on the grounds

4    moved, the motion is denied as to 12-9.

5              What is 12-11?

6              MR. PETERS:  It purports to be the Retail

7    Purchase Agreement for a 2012 Fiat 500 Sport.

8              MR. CASTLE:  No, Your Honor.  12-11, I

9    believe, is the purchase for the Fiat -- or for the Mini

10   Cooper.

11             MR. PETERS:  Well, it's possible.  I don't

12   have a current exhibit list.  But in the one provided by

13   the government that's the description of 12-11.

14             THE COURT:  Would you scroll that down?

15             MR. PETERS:  I can bring it up on the screen

16   here if you give me a moment, Your Honor.

17             THE COURT:  The document I have appears to

18   be a Retail Purchase Agreement from Desert Mini of Las

19   Vegas.  The customer is identified as Skyline Ventures

20   Associates for a Mini Cooper.  And it's got the price.

21             MR. CASTLE:  Yes, Your Honor, this involves

22   the purchase of the Mini Cooper.

23             THE COURT:  The motion will be denied as to

24   that exhibit.

25             With respect to 12-12, make sure I've got

1   the right one, 12-12 is the Agreement to Provide

2   Insurance.  It appears to be signed.  Again, subject to

3   authentication and foundation, on the grounds moved

4   upon, the motion is denied as to the Agreement to

5   Provide Insurance.

6              And with respect to 12-13, that appears to

7   be the Division of Motor Vehicles information showing

8   the lienholder.

9              MR. CASTLE:  Your Honor, I believe that that

10  particular document reflects the selling of the Mini

11  Cooper to another party at a later date.  Am I correct

12  about that?  I think that's what that document is.  I'm

13  sorry, I thought I had a copy of that.  And if it is in

14  fact that document, we don't plan on introducing that

15  in.

16             THE COURT:  It has attached to it a vehicle

17  application for a Utah title.

18             MR. CASTLE:  Your Honor, that's not one we

19  intend to offer.

20             THE COURT:  That one the motion is granted.

21             With respect to 12-10, let me get the

22  document in front of me, this is the Resolution of the

23  Board of Directors that does have a signature on it.

24             MR. CASTLE:  Yes, Your Honor.

25             THE COURT:  And the court denies the motion,

1    but provides the following explanation and limitation:

2    To the extent that there is foundation laid and the

3    signature authenticated and delivery is proved, in other

4    words, that it existed someplace other than just in

5    Mr. Diehl's file, it will be received in evidence.  I

6    think it may be also helpful on this motion to address

7    the issue of personal use.  To the extent that --

8    Ms. Carillo -- is that her name?

9              MR. CASTLE:  Carillo, yes.

10             THE COURT:  -- is called to testify, I think

11   it would be permissible to ask her if in fact she used

12   the car, it would be permissible to ask her if in fact

13   she had any official responsibilities as an employee,

14   officer, or other person on behalf of SVA.  Beyond the

15   fact that her involvement in the case -- beyond that

16   what -- the nature of her personal relationship with

17   Mr. Diehl, if any, was I think is irrelevant.

18             MR. CASTLE:  Point of clarification, Your

19   Honor, she will also provide testimony about Mr. Diehl

20   buying personal items for her postpetition.  We recall

21   your ruling on that, Your Honor, so we would bring her

22   to testify about -- I'm just going to call them gifts,

23   Your Honor, for lack of a better word, that Mr. Diehl

24   purchased for her.  And we will tie that up in terms of

25   coming out of the SVA account after Mr. Diehl filed

1    bankruptcy.  And I am hopeful she can --

2              THE COURT:  If in fact that the government

3    is able to establish evidence that SVA funds out of an

4    SVA account were used for personal items for her, that

5    would be admissible.

6              MR. CASTLE:  Thank you, Your Honor.

7              THE COURT:  Let me also just make one

8    further observation that may be helpful to the parties.

9    With respect to the funds that were used to purchase the

10   vehicles, it is going to be important to establish that

11   the funds came from SVA.  The fact that title was taken

12   in the name of SVA and Mr. Diehl tended to control that

13   would go to the fact as to whether or not he was a

14   managing executive of the company.  To go beyond to show

15   that those funds in fact were SVA funds as opposed to

16   his own personal funds, you're going to have to complete

17   the link that they were in fact SVA funds and he was

18   using an SVA account in some way in order to tie that

19   together.  Any questions about that?

20             MR. PETERS:  Yes, Your Honor.  Are you

21   saying that foundation would need to be laid before the

22   exhibit evidence could be admitted as to these vehicles,

23   is that what the court is saying?

24             THE COURT:  Well, to the extent --

25   foundation will have to be laid before the exhibits are

1     admitted and shown to the jury.  As to the fact as to

2     whether or not he was the managing executive, I'm not

3     going to require that be out of the presence of the

4     jury.  To the extent that you're claiming that that was

5     the use of SVA funds for his personal use, then you're

6     going to have to establish that outside of the presence

7     of the jury so that there is a -- right now I don't have

8     sufficient evidence in front of me to make a

9     determination as to whether they were SVA funds or not

10    SVA funds, and I will make a preliminary decision about

11    that before we submit it to the jury.  Does that clarify

12    that issue?

13              MR. CASTLE:  It does, Your Honor.  If I

14    could just ask one question.  That doesn't preclude us,

15    though, from eliciting testimony from Ms. Carillo that

16    she used the car for her personal use, that she did not

17    have a business relationship with SVA.

18              THE COURT:  No, it does not preclude that.

19              MR. CASTLE:  Thank you, Your Honor.

20              THE COURT:  I believe that's permissible.

21    Any -- let's go to -- anything further?

22              MR. CASTLE:  Your Honor, 12-14, I know that

23    was a part of their motion, but I'm asking the court to

24    consider this as well because it connects up to a couple

25    of things that are going on with Mr. Diehl relating to

1    the purchase the Mini Cooper and related to his

2    Statement of Financial Affairs and his testimony at the

3    341 meeting.

4              THE COURT:  I'm looking for 14.

5              MR. CASTLE:  I have a copy.

6              THE COURT:  That's the driver's license and

7    it's got the business card.

8              MR. CASTLE:  Yes.

9              THE COURT:  Was that attached to the

10   resolution?

11             MR. CASTLE:  Your Honor, this is a

12   transaction that occurred on May 15th of 2012.

13             THE COURT:  Okay.

14             MR. CASTLE:  So, no, it would not be

15   attached to that.

16             THE COURT:  I now see the e-mail.  This is

17   the permission to have the keys made.

18             MR. CASTLE:  Yes, where he's representing --

19             THE COURT:  The motion is denied as to that.

20             MR. CASTLE:  Thank you.

21             THE COURT:  All right.  Anything on that

22   motion before we go to the other one?  Any further

23   argument on the other motion before I announce my ruling

24   on it?

25             MR. HIRATA:  No, Your Honor.

1          MR. WASHBURN:  Any further argument that

2    would change the ruling that you're about to announce,

3    Your Honor?

4          THE COURT:  It depends on what you say.

5          MR. WASHBURN:  No, Your Honor.

6          THE COURT:  Let me tell you how I approach

7    this ruling.  First of all, with respect to the evidence

8    that we've just considered, I think it falls under the

9    classification of intrinsic evidence.  I think one of

10   the elements of proof is that Mr. Diehl was a managing

11   executive, that's one of the requirements that the

12   government is required to prove, and the documents go to

13   the fact that he was a managing executive and was

14   extrinsic evidence -- excuse me, intrinsic evidence.

15         MR. CASTLE:  Thank you, Your Honor.

16         THE COURT:  With respect to the other

17   motion, I do not find that the evidence is intrinsic

18   that has been proffered by the United States.  So I

19   believe that the proper analysis is under a 404(b)

20   analysis as to that evidence.

21         Let me explain the way I'm analyzing this

22   and give you a chance to respond to that before I

23   finalize my ruling.  I believe that it is -- if this

24   evidence is to come into evidence, it must come in under

25   the exception for other acts that satisfy the element of

1   proving intent or motive.  And the intent and motive

2   that I believe is at issue is to whether there was an

3   intent to defraud by Mr. Diehl at the time -- excuse me,

4   that he signed -- that he signed the declaration in

5   which he failed to disclose SVA.  As to that issue, the

6   way I view this is if there was evidence prior to the

7   time that he submitted that declaration that he had used

8   the SVA account as his personal account to pay for

9   personal expenses, and then he continues to use the

10  account to pay for personal expenses after he filed the

11  declaration, then I think the post-filing conduct does

12  indicate that he had an intent, at least there's an

13  argument for the jury from which the jury -- could be

14  argued to the jury that he had an intent to continue to

15  use the SVA account post-filing the same way he did

16  before filing, and that was an intent to fail to

17  disclose that information to defraud the creditors and

18  preclude them from considering assets of SVA in

19  assessing any plan of reorganization.  So my thought is

20  that the government would be required to prove as

21  foundation that there was pre-filing, pre-declaration

22  use of the SVA account for personal use, and that

23  subsequent to the filing Mr. Diehl continued to use the

24  SVA account for personal use, and that that would

25  then -- if that foundation is satisfied, both the

1    pre-filing and the post-filing would come into evidence.

2    However, I think at some point the use of the account

3    becomes so remote -- so distant from the time of the

4    filing that its use for arguing intent serves no

5    purpose.  It would appear to me that that date would be

6    the date of the filing of Mr. Diehl's personal tax

7    return in October of 2012.

8              So the way I've been analyzing and thinking

9    about this the use of the personal account should be

10   considered separately prior to the filing, use of the

11   SVA account for -- I misstated that.  I'll restate it so

12   it's clearer.  The use of the SVA account for personal

13   use should be separated pre-filing and post-filing, and

14   the post-filing period would continue up until I think

15   it's middle of October of 2012 when he filed his

16   personal income tax return.  Beyond that I believe that

17   it becomes so distant and so separated from the time of

18   the filing that it has -- that its prejudicial value

19   then would outweigh any probative value it would have to

20   support the intent element.

21             Questions?  You can try to convince me I'm

22   wrong in this, and if I'm wrong, I'll correct.

23             MR. CASTLE:  Your Honor, I understand I'm

24   not the one that argued that motion, but you raised

25   another issue, and that is, if you are cutting off the

 1   evidence as of October related to Mr. Diehl's intent,

 2   that it would be our position that any argument about

 3   what happened after that point in favor of Mr. Diehl,

 4   whether he had a plan confirmed or not, whether the case

 5   is still open is equally irrelevant as a defense, and it

 6   wouldn't be appropriate for them to make that argument.

 7   If they make that argument, then I would think we would

 8   be able to show that evidence.

 9          THE COURT:  And I won't rule on that, but I

10   will acknowledge that that is an issue you can raise.

11   And if the post-October information is offered, I'll

12   hear argument at that time whether or not there is some

13   additional analysis that should be considered in

14   determining weather it's relevant at that point.

15          So any further comments, objections,

16   clarifications from counsel?

17          MR. WASHBURN:  I guess I'm just curious on

18   the tax return, Your Honor, where that comes from.  I

19   mean if I were looking at it I would say that the

20   intent -- if you were going to do a cutoff date, on that

21   September 27th when the order is filed where they say,

22   hey, SVA is an entity that's closely held related to me,

23   and, you know, it's been fully disclosed, that date

24   makes sense to me.  I'm just interested in what the

25   rationale was behind it.

1            THE COURT:  I'll tell you what my rationale

2   is and you can talk me out of it if I'm wrong.  My

3   rationale is that the personal tax return that's filed

4   in October has relevance, and that the false return that

5   is alleged here is the Wasatch Pacific return and

6   whether or not income should have been reported on the

7   Wasatch Pacific return.  The personal return becomes

8   relevant as to whether or not that was a material

9   failure to disclose as a part of the Wasatch return.  If

10  Mr. Diehl had reported the million dollars on the

11  personal return, the Wasatch tax return may have been

12  immaterial because it in fact was required to flow

13  through a Subchapter S return in any event.  So if the

14  return was reported on the October return, it doesn't

15  matter that he failed to report it on the Wasatch

16  Pacific return.  But if he didn't report it on either

17  return, then it's relevant to show that there was

18  personal income that was not reported.  Does that make

19  any sense?

20           MR. WASHBURN:  Not really, and the reason I

21  say that, Your Honor, is the return that's being filed

22  in October of 2011 is a return -- or rather in October

23  of 2012 is a return for 2011.  I guess I'm just getting

24  wires crossed between the tax case and the bankruptcy

25  case because from our perspective what we're attempting

1    to do is understand what its relevance is on the

2    bankruptcy case.  The tax case, Your Honor --

3                THE COURT:  Isn't the October '12 personal

4    return for the tax year 2011?

5                MR. WASHBURN:  That's correct.

6                THE COURT:  So it's the same tax year as the

7    Wasatch Pacific tax return.

8                MR. WASHBURN:  Yes, Your Honor.  And I guess

9    I'm trying to understand how the personal expenses in

10   2012 -- you know, Your Honor, it probably isn't worth

11   the couple of weeks' difference.  I was just trying to

12   understand what the rationale was.  And I understand it

13   now, and I'm not sure that there's enough at stake for

14   it to be worth disputing over a couple of weeks.

15               THE COURT:  I recognize and I apologize, but

16   I think the government's going to have to redo some of

17   its exhibits to break it down into these categories, but

18   hopefully that won't be much more than a reorganization

19   problem.

20               MR. HIRATA:  Just one question of

21   clarification, Your Honor.  So based on the court's

22   ruling today, is the presumption, if you will, that the

23   end point is in October of 2012, that should either side

24   choose to go beyond that you will --

25               THE COURT:  New issue, it's a new issue at

1    that point.

2              MR. HIRATA:  Okay.  Fair enough.

3              THE COURT:  I'm not precluding that, that's

4    the guideline.  And obviously as the case develops,

5    there may be issues that would make it relevant.

6              MR. HIRATA:  Okay.

7              THE COURT:  Anything further before we

8    recess?

9              MR. HIRATA:  No, Your Honor.

10             MR. WASHBURN:  No, Your Honor.

11             THE COURT:  We will be in recess.

12             (Whereupon, the matter was concluded.)

13                      *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3    State of Utah

4    County of Salt Lake

5

6         I, Karen Murakami, a Certified Shorthand Reporter

7    for the State of Utah, do hereby certify that the

8    foregoing transcript of proceedings was taken before me

9    at the time and place set forth herein and was taken

10   down by me in shorthand and thereafter transcribed into

11   typewriting under my direction and supervision;

12        That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15        IN WITNESS WHEREOF, I have hereunto set my hand

16   this _2nd_ day of November, 2017.

17

18

19                              ___Karen Murakami_____

20                              Karen Murakami, CSR, RPR

21

22

23

24

25